FILED

04 JUL 19 AM 11:

U.S. DISTRICT COU
N.D. OF ALABAM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| TRACY O'NEAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CV-03-PT-2191-E |
| | ) | |
| TYSON FOODS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

JUL 19 2004

## MEMORANDUM OPINION

This cause comes on to be heard upon the defendant Tyson Foods, Inc.'s ("Tyson") motion

for summary judgment, filed on May 27, 2004, and plaintiff Tracy O'Neal's ("O'Neal") motion for

protective order, filed on June 4, 2004.[1]

## FACTS[2] AND PROCEDURAL HISTORY

Tyson is an Arkansas-based employer that operates a chicken processing plant in Heflin,

Alabama. O'Neal currently works at Tyson's Heflin processing plant. O'Neal began working at the

Heflin plant in 1993 as a saw operator. (Pl. 43-44) After the plant discontinued the line on which she

worked, plaintiff moved to a different position, "stamping the Julian dates and kill dates on the boxes

to sliding them into the boxes to send them down for strapping." (Id.) Plaintiff worked in this

position until October 2, 1995, when she began working as a quality control technician. (Pl. 44)

---

[1] The latter was filed pursuant to FRCP 37 to exclude any testimony or reference to the testimony of Tonya
Averitt, Helen Champion, Louise Doss, Sherry Stephens and Virginia Turner.

[2] This court notes where facts appear disputed.

1

52

In September 1998, plaintiff bid on a position as a parts room attendant on third shift. (Pl. 40, 44, DX20). Third shift, or night shift, runs from 9:30 p.m. until 6:30 a.m. (Pl. 51) Plaintiff was awarded this position in November 1998 and has worked in this position since that date and at all times relevant to this matter. (Burdick Dec. 11) Mike Ford ("Ford") was the third shift maintenance supervisor who supervised the maintenance crew and the parts room. Ricky Nappier ("Nappier") is the maintenance supervisor on second shift. According to plaintiff, Ford and Nappier supervised her in 2001 and 2002.[3]

Some of the written duties of the parts room attendant include lifting 50 pounds with no assistance, conducting physical inventories, and being licensed to operate a forklift. (DX 20)[4] According to Ford's deposition, the job requirements for a parts room technician from 2001-2003

---

[3] In his deposition, Nappier stated that he supervised plaintiff during her first pregnancy and had no problems with her work performance during that time. Nappier stated that O'Neal does a good job and knows the parts room job. Ford similarly stated that O'Neal was a dependable worker who always showed up for work.

[4] Tyson and plaintiff appear to agree that at times plaintiff was asked to operate a forklift. The court provides a full excerpt of the document relied upon by defendant:

Job Involves

| | |
|---|---|
| i. | Receive and issue all material, parts, and supplies for the parts room. |
| ii. | Must be able to file and keep accurate records and logs. |
| iii. | Process (sic) above average mechanical and mathematical skill necessary to spec. parts. |
| iv. | Handwriting must be legible, required for logs. |
| v. | Must be able to lift 50 lbs. with no assistance, necessary when receiving material.. |
| vi. | Must be licensed to operate a forklift. |
| vii. | Work weekends as required. |
| viii. | Conduct all physical inventories. |
| ix. | Keep parts room neat and orderly |
| x. | Must have a valid driver's license and meet Tyson's safety requirements. |
| xi. | Perform other duties as assigned by supervisor. |
| xii. | Must not have more than 2 occurrences. |
| xiii. | No more than 2 counseling statements within the last 6 months. |
| xiv. | No serious counseling statement within the last 6 months. |

Interestingly, this court notes, this written job description mentions requiring a forklift license but does not mention requiring actual operation of the forklift.

2

were "keeping up inventory, getting parts for the maintenance men, unloading trucks as needed, putting up parts as needed, and from time to time they had to run to other facilities to pick up materials for us." Additionally, Ford stated, the parts room technician was responsible for generating and issuing out work orders and keying them in.

Ten to twelve maintenance men (in two crews) provide 24-hour coverage to the Heflin plant. By plaintiff's account, there are four people in the parts room that provide 24-hour coverage to the plant, but only one parts room attendant works during any shift. A shift is 12 hours. Tyson alleges that all maintenance men were required to be licensed forklift operators. However, Ford expressed uncertainty about who passed the test and said he would not know unless he went to the safety office to check a list. Ford further stated that the parts room employees must be certified to drive a forklift but that he was unsure if all were certified.[5]

Tyson has various policies and practices regarding medical conditions and work restrictions. *See* Affidavit of Lisa Burdick ("Burdick Aff.").[6] According to Tyson, these policies and practices depend on certain factors, including, but not limited to, whether the medical condition is (a) considered a disability under the ADA, (b) a temporary condition, (c) pregnancy, (d) a work-related injury, and/or (e) a non-work-related condition or injury. *Id.* Another factor in applying Tyson policies, Burdick stated, is whether an employee's treating physician has imposed work restrictions. *Id.*

Prior to January 2002, the parties appear to agree, Tyson's Leave of Absence Policy would

---

[5] Plaintiff points out (based on Ford's deposition) that Scott Prater could not climb a ladder or operate a fork lift but was accommodated in the parts room for a job-related injury.

[6] Burdick has been the Oxford Complex Human Resources Manager for Tyson since July 2000.

not permit an employee who had non-work-related temporary medical restrictions that did not allow him/her to perform all the duties of his/her job (except pregnant employees) to continue working in his/her position.  Further, Tyson would not reassign an employee falling under the above policy even if a job were available that he could perform under the work restrictions.  *Id.*; *see also* DX 4.[7] Moreover, Tyson would not create a light duty job for that employee but would instead place that employee on a leave of absence until he/she could perform all the duties of their particular job. (Id.) If the employee was eligible for leave benefits, (such as short term disability, etc.), such leave benefits would be paid. (Id.)

During this same time period, Tyson alleges, it provided preferential treatment to pregnant employees with work restrictions that prevented them from performing the duties of their job. (Burdick 24).  Prior to January 2002, Burdick alleges, Tyson accommodated a pregnant woman with work restrictions in the same way that it accommodated an employee with an ADA qualifying disability or a work-related injury. (Burdick 24).  As such, if a pregnant employee's work restrictions did not allow her to perform all the duties of her job, Tyson would attempt to provide a reasonable accommodation (i.e., reassign her if a suitable job were available, or create a light duty job for her). (Burdick 24). Tyson did not provide these same accommodations to nonpregnant employees with non-work-related temporary medical conditions resulting in work restrictions. (Burdick 24-27, 36).

Effective January 1, 2002, Tyson alleges, its leave policy and practice changed. (Pl. 188) According to plaintiff, she did not learn the details of this new policy until February 6, 2002.  Under

---

[7]Tyson cites Def. Ex. 4 to O'Neal's deposition as reflecting the written policy in effect pre-2002 (during O'Neal's first pregnancy).  This court cannot find verbatim statements in Exhibit 4 document mirroring the statements in Burdick's affidavit regarding pregnancy prefential treatment, etc.  Under the "Reason for the Policy," the manual does state: "A Leave of Absence is granted to people for non-work or work related temporary disabilities ... as provided herein."  Both  parties appear to agree on this pre-2002 policy.

4

this new policy and practice, Tyson treated pregnant employees with work restrictions in exactly the same manner as it treated non-pregnant employees with any other non-work-related temporary medical condition resulting in restrictions. (Pl. 188, 193)  Thus, a pregnant employee with work restrictions that prevented her from performing the duties of her job was no longer treated preferentially but instead was placed on a leave of absence until her work restrictions were either eliminated, changed, or reduced to the point where she could perform the duties of her job.  Under the new policy, Tyson asserts, it no longer created light duty jobs or reassigned pregnant employees to other available jobs unless the employee suffered from an ADA-defined disability or a work-related injury. (DX 9)[8]

Plaintiff became pregnant with her first child in June 1999.[9] (Pl. 92-93)  Pursuant to Tyson's policy at the time, O'Neal acquired a Maternity Work Permit form from Tyson's nurse to take to her physician. (Pl. 98; DX4, 5)  The nurse filled out the top half of the form, checking the "conditions ... that regularly prevail on this employee's job" to include "sitting" and "lifts more than 10 lbs." (Pl. 98-100; DX5)  In the handwritten remarks section, the nurse stated "team member must be able to lift over 50 pounds unless you issue a restriction. Has to climb up on ladder frequently." (DX5)  O'Neal's physician completed the remaining part of the form, instructing that plaintiff was "only able to lift maximum of fifteen pounds, with no climbing on ladder." (Pl. 100; DX5)

After this appointment, plaintiff returned the form to the nurse at the Heflin plant. (Pl. 10001, 215)  While not performing all of the duties of her job as a Parts Room Attendant, plaintiff continued

---

[8] Def. Exhibit 9 is the "new" policy effective January 2002.  Section 12, entitled "Non-Work Related Temporary Medical Conditions Guidelines" reads: "Tyson Policy does not allow for modified duty for non-work related temporary medical conditions."

[9] Plaintiff does not assert discrimination by Tyson in regards to her first pregnancy.

to work in that position. (Pl. 101-02) Based on her medical restrictions for the first pregnancy, plaintiff did not lift anything over fifteen pounds or climb on a ladder to get a part off a high shelf – both duties she performed before being placed on work restrictions. (Pl. 102-03) Plaintiff's work restrictions remained the same until a doctor's appointment sometime after December 30, 1999 at which time her physician added a restriction of "minimize stooping and bending, no forklift operation." (Pl. 123; DX5)  Plaintiff worked in compliance with the doctor's restrictions for the remainder of her pregnancy. (Pl. 124)  She took a leave of absence on March 3, 2000 and delivered her first child on April 5, 2000. (Pl. 97, 126; DX6)  Plaintiff returned to work from her leave of absence in late May 2000 and resumed her former position, performing all of the duties of Parts Room Attendant on third shift. (Pl. 97, 130-31)[10]

Plaintiff became pregnant with her second child sometime in early December 2001. (Pl. 139) In early January 2002, Plaintiff acquired a temporary disability work permit form from Tyson's nurse to take to her next doctor's appointment.[11] (Pl. 142) The nurse completed the top half of the form and checked as "conditions . . . that regularly prevail on this person's job" high humidity, slippery floor, sitting, lifts more than ten pounds and on feet a great deal.[12] (DX10) Additionally, the nurse wrote a note that plaintiff was "required to operate a forklift." (DX10) O'Neal took this form to her doctor's

---

[10] Again, this court notes, plaintiff expressed her belief that Tyson's actions in regards to her first pregnancy were consistent with its policies and that she was not denied any benefit, accommodation, or wage continuation by Tyson. (Pl. 127-28)

[11] O'Neal testified that she went to the nurse's station and picked up a temporary work permit form just as she had done with her first pregnancy. (Pl. 142) Apparently, the second shift nurse completed the form for Plaintiff, but before her doctor's appointment, Plaintiff discussed the form with the third shift nurse. (Pl. 218) Plaintiff claims that the third shift nurse told her that "we no longer fill these out for pregnant workers," but to "go ahead, have it filled it [sic] out and if we need it, we'll have it." (Id.) Plaintiff then had the doctor complete the rest of the form.

[12] O'Neal agrees that the checked conditions regularly prevailed in her job, with the exception of the slippery floor. (Pl. 143-44) Plaintiff testified that the floor was only occasionally slippery. (Pl. 144)

appointment on January 10, 2002, and the doctor placed O'Neal on work restrictions similar to those during her first pregnancy, including "no forklift, do not climb ladder, weight limit for lifting, ten to fifteen pounds." (Pl. 144-45; DX10) Plaintiff returned this form, including her personal physician-imposed work restrictions, to Tyson.[13] (DX 10)

O'Neal returned to her doctor on January 14, 2002 due to bleeding, and she took FMLA-type leave for one week. (Pl. 145-46; DX10) As a result, O'Neal did not work at all the week of January 14, 2002, returning to work on her next scheduled shift on Monday, January 21, 2002. (Pl. 146) Upon returning to work, O'Neal continued to work as a parts room attendant without performing all of the written duties of that position due to her medical restrictions. (Pl. 147, 152-56, 219) For example, prior to being placed on work restrictions, plaintiff's job required her to carry items that weighed more than fifteen pounds, to climb a ladder to reach items in the parts room that were above her immediate reach, and to operate the forklift if asked by her supervisor because she was the only hourly employee certified to operate a forklift on the third shift. (Pl. 155-156)[14]

---

[13] Plaintiff's work restrictions were never changed, reduced, or eliminated prior to the birth of her second child. (Pl. 157)

[14] Regarding the forklift issue, the court notes, plaintiff testified as follows:

Q: [In January 2002] you would have been operating the forklift from time to time?
A: The forklift we didn't do on third shift. Like I said, we didn't receive material in (*sic*) on third shift.
Q: Okay. And I've seen that you've said that. I want to be clear about whether it was something that had you not had this restriction, you would have done from time to time on third shift, just less frequently?
        Ms. Haynes: Object to form.
A: If we received deliveries at night, yes, yes, sir.
Q: And that did happen from time to time?
A: On night shift, no.
Q: That's what I'm trying to get clear. You're saying that on the third shift in January of 2002 the forklift was not something that you would do at all, whether you were restricted or not?
A: Correct.
Q: So this restriction didn't mean anything to change your job?
A: I never did anything pertaining to my job, but they would occasionally ask me to help production out and I would have to get on the forklift then, but that was a production side job and it was not a requirement job of mine. I did it upon asking.

On February 6, 2002, thirteen working days after plaintiff was placed on work restrictions by her personal physician, plaintiff met with Carlos Gonzales (Third Shift HR Manager at the time), Ford, and Nappier.[15] (Pl. 158-60)  The meeting took place during O'Neal's regular work shift at approximately ten o'clock p.m. in the human resources office at the Heflin facility. (Pl. 164-65) Gonzales informed plaintiff that the policy relating to non-work-related temporary medical conditions had recently changed and that because her doctor had placed her on work restrictions that limited her ability to perform the duties of her job, she was going to have to go on leave.[16] (Pl. 165)

---

Q: I don't know what you mean about that last part, I did upon asking.

A: I got on the forklift and we would put tubs, dirty tubs on the outside of the plant and night shift did not have anybody certified to run the forklift.  If there was tubs outside, they would ask me, since I was certified, to come out of the parts room, load the tubs up and put them in the back side of the plan so they could wash them.

Q: So operating the forklift on third shift was something you were assigned to do in January of 2002?

　　Ms. Haynes - Object to form.

Q: Right?

A: Only when asked to help – only when asked to help on the production side.  It wasn't anything that was required in the parts room, because we did not– the forklift in the parts room is for receiving deliveries.

Q: ...I'm with you now, that you're saying the forklift was not part of the parts room clerk position that you did on third shift, but operating the forklift was something that you ... did in January of 2002 when asked?

A: Correct.

Q: And it was something that they asked you to do it (sic) because they needed it done?

A: Correct.

Q: And they needed you to do it because you were the only one there who was certified?

　　Ms. Haynes: Object to the form.

Q: The only hourly employee certified?

A: Correct.

Q: Okay.  So it was important when they would ask you to do it that it be done; right?

　　Ms. Haynes: Object to the form.

A: Correct.

Q: And this restriction affected that, didn't it?

A: Yes, sir.

　　Ms. Haynes: Object to the form.

[15] Nappier does not remember attending this meeting.

[16] On January 10, 2002, according to Tyson, the January 1, 2002 policy governed O'Neal's second pregnancy because she was placed on work restrictions by her physician that limited her ability to perform the duties of her job - after the policy went into effect. (Burdick 36.)

In this regard, Burdick testified:

Q: Do you know why Ms. O'Neal was placed on a leave of absence in 2002?

Plaintiff asked Gonzales to show her the new policy, and he gave her a copy of the new policy. (Pl.

165-66)[17] According to O'Neal, she had previously inquired about new policy changes and Gonzalez,

knowing she was pregnant, stated that the new policy did not affect her.[18]

---

A: Yes, I do.

Q: Why?

A: She had medical restrictions that limited her ability to perform the essential functions of her job, and policy dictated that that was what would happen.

Q: And is it Tyson's policy (sic) anyone with medical restrictions will be made to go on leave of absence?

A: Non-work-related medical restrictions during this policy.

Q: And how do you determine that if she became pregnant in December which policy she will fall under?

A: It would be when her doctor's restrictions came into place.

Q: Not when she got pregnant?

A: Right.

Q: Or not when she became employed?

A: Right.  It would be when there is an actual doctor's restriction, what policy she will fall under.

[17] Specifically, plaintiff alleges in her deposition, Gonzalez stated:

Q: ...If you would go through what was said again in that meeting.

A: He [Gonzalez] told me they was putting me on a parental leave of absence, that the policy had changed and, paraphrase, they did not cater to pregnancies anymore, or did not acknowledge pregnancy medical conditions anymore, something to that effect, and that since I had imposed restrictions, that I had to go on leave.

Q: What did you say?

A: I asked him where was the new policy and show me where it was at in the policy.

Q: Continue telling me everything that was said in the conversation.

A: He told me – he opened it up and looked for it himself.  He could not come off (sic) with it right off the bat, so he gave me a copy.  He said you can finish out your shift and you can look through the handbook and just read through it, you'll probably find it.  Then I asked him, I said, why am I just now being told about this, I brought this restriction sheet back the first of January, and it's the 2nd or the 6th of February and I'm just now being told about this.  And he said it was a new policy and that we weren't all up to speed on it and that Melody Lloyd had been talking to corporate legal and they felt like it was in the best interest to put me out.  And I asked him what he meant by that and he said if you was to climb a ladder, and I interrupted him, I said why would I do that when I'm not supposed to.  And he sighed and rolled his eyes and he said if you were to climb a ladder and fall, we would be responsible for you and your child.  And I told him, I said, I don't agree with this.  I told you you backdated my paperwork, and you made it sound like I was coming to you for this, when that was not the case, and he said it was just typical standard form.

[18] The court notes that this alleged fact is derived from plaintiff's July 5, 2002 letter to the EEOC alleging discrimination.  In that letter, plaintiff states: "Two weeks prior to this [the February 6, 2002 meeting] the plant went down for mechanical problems and I was sent to get the parts needed to get the plant up and running again.  During this down time, Carlos informed the employees of the policy changes and who it affected and how.  When I returned with the parts, I went to the break area because it would be a while before the plant was running again and I went ahead and took my break then.  Carlos and Nancy were sitting in there at the time and I said to Carlos 'I heard there were policy changes and I would like to know what they were.'  Now he knew then I was pregnant.  His response was 'they don't pertain to you only to those with a years (sic) service or less.'"

9

Plaintiff expressed her strong disagreement with the new policy and became upset because she had been working under her doctor's restrictions since January 10, 2002, just as she had with her first pregnancy, and no one had mentioned a policy change to her. (Pl. 166-68; Ford 62) According to Ford, plaintiff stated that she needed the paycheck to support her family.  Gonzales informed plaintiff that he had just learned about the corporate policy change and that the employees at the plant level were not yet "up to speed on it." (Id.)  Gonzales ended the conversation by explaining Tyson's policy on "short term disability pay" and informing plaintiff that she would be paid two weeks pay for every year that she had been employed (which amounted to 16 weeks of pay) at half her pay.[19] (Pl. 167)  He further explained the issues relating to insurance but, because plaintiff was covered under her husband's insurance, this information did not pertain to her.[20] (Id.)  Plaintiff was upset over the new policy and how it affected her, but she testified that all the things Gonzales told her about the new policy were correct. (Pl. 169)

Plaintiff was placed on leave, and the paperwork was backdated one month to reflect that plaintiff had requested the leave (even though she had not).  According to O'Neal, she was unaware of any policy change before being placed on leave.[21]  Plaintiff states that she looked up the policy on the corporate website the night she was placed on leave, and the policy read differently from the copy provided by Gonzalez, adding that an employee would be placed on leave unless he/she could perform the essential functions of the job.

_____

[19] Plaintiff received all the pay provided by Tyson's policy while she was on FMLA leave and also received the one week's vacation pay to which she was entitled.

[20] Incidentally, O'Neal was fully covered by her husband's insurance during her leave of absence.

[21] *But see supra* footnote 17, derived from a letter O'Neal sent to the EEOC.

At the time of Nappier's deposition, he stated that he did not know any policy changes that required O'Neal to go home due to her pregnancy or even what the policy was for non-work-related injuries. Nappier was allegedly never told that O'Neal could not drive a forklift, lift over fifteen pounds, or climb a ladder. Nappier understood that O'Neal was made to take leave because she was pregnant. At the time plaintiff first came to Ford to discuss being placed on leave, Ford also did not know of the policy change.[22]

Plaintiff gave birth to her second child in August 2002 and returned to work on October 7, 2002. (Pl. 22, 175-76) Before she returned to work, plaintiff underwent a return to work health assessment on October 6, 2002. (Id.; DX11) This health assessment was completed by Tyson's nurse to confirm that plaintiff was physically able to return to work performing the essential functions of her job. (Pl. 175) O'Neal also submitted a note from her physician, releasing her to return to work

---

[22] Specifically, Ford stated:

Q: Did you and Tracy O'Neal have conversations about her taking leave?
A: To some extent, yes.
Q: How?
A: She mentioned to me she didn't think it was right that they placed her on leave. And I asked her to speak with Melody Lloyd about the situation and find out exactly what happened.
...
Q: Did you agree with her that you did not think it was right either?
A: I felt like she needed to go to HR because I am not in a position to answer those type questions.
...
Q: Did you tell Ms. O'Neal that you thought she could do the job and you did not understand why she was going on leave?
...
Q: Did you tell her you didn't understand yourself?
A: I didn't understand because I didn't understand the policy change at the time. I was still unaware of the policy change at the time.
Q: And did you tell her that you thought she could do her job?
A: According to the old policy.
...
Q: I had asked you the question if you told Ms. O'Neal that you felt she could do the job – continue doing the job.
A: I told her I thought that she could, but she would have to go through HR to have the problem resolved. Once again, that was before the policy change that I was aware of.

on October 7, 2002 without any restrictions. (Pl. 177-179; DX14). Plaintiff returned to her former position (with the same benefits and same job status) as parts room attendant on October 7, 2002, after a total of thirty-four (34) weeks of leave from Tyson. (Pl. 179-82)

Plaintiff received short term disability from February 6, 2002 until June 8, 2002. According to plaintiff, from that date until October 2002 when she returned to work, she received no money.[23]

According to plaintiff, her physician-imposed restriction did not affect her job because the parts room was open and the maintenance men came in and got what they needed, as plaintiff followed behind them to make sure they got what they wanted. Plaintiff allegedly did not have to lift over 15 pounds, as the men picked up their own parts. As for forklift operation, *see* plaintiff's testimony *supra*.    According to O'Neal, she operated a forklift in 2001 three times (once to recertify). After plaintiff was placed on leave without pay, the parts room was left unattended, the inventory was not maintained, and the maintenance men came and went as needed to get the parts, climbing the ladder if required to retrieve a part. Nappier confirmed that it was quicker for a maintenance man to go get a part because the maintenance crew did not always know the name of the part or how to make the parts room attendant understand what part they needed.

It was and still is common practice at the Heflin plant for maintenance men to come and go in the parts room, although procedure dictates that they stop at the counter and a parts room technician assist them with their request. Ford has never disciplined anyone for opening the parts room door to obtain their own parts. Though lifting 75 pounds is a written job requirement of the parts room, plaintiff points out, Ford testified that he has never required a parts room technician to lift that much unassisted. According to O'Neal, she lifted between 50-75 pounds maybe once a

---

[23] While O'Neal references an exhibit 14, the court cannot find such an exhibit.

week.

Plaintiff alleges the following regarding other Tyson employees who have allegedly been accommodated: (1) Phillip Gresham ("Gresham") has a heart condition and was accommodated in the parts room.  Gresham does not lift over fifteen pounds and does not climb ladders.  According to plaintiff, Gresham does not drive a forklift[24]; (2) Louise Doss[25] ("Doss") has a heart condition and has been accommodated in the parts room.  Doss lifts only seven to eight pounds and has climbed only a step ladder.; and (3) Coy Snow was temporarily assigned to the parts room for a few days.[26]

Plaintiff offers three alleged exceptions to the policy of not accommodating non-work-related injuries and pregnancy-related conditions when she was placed on leave in 2002: Mary Tucker ("Tucker"), Snow, and O.K. Parks ("Parks").  Tucker, plaintiff alleges, has osteoporosis and was placed on light duty by the plant nurse.  Snow, plaintiff alleges, is a refrigeration technician in plaintiff's department who had his hours reduced from a 12-hour shift to an 8-hour shift for

_____

[24] However, Nappier stated that he had seen Gresham drive a forklift a couple of times but couldn't swear to the exact number of times.

[25] Louise Doss is one of the subjects of plaintiff's motion for protective order. *See infra.*

Louise Doss's sworn declaration stated: "Over a period of the past several years, I have received treatment and/or medical for medical problems.  I have missed work due to medical problems, but I always returned to work with no medical restrictions.  In April 1995, I suffered from work-related tendonitis, and had a restriction from my doctor limiting 'repetitive work' to four hours per shift.  I received an accommodation from Tyson in connection with this work-related problem.  I have never received any accommodation from Tyson in relation to a non-work-related medical problem."

[26] While plaintiff cites Ford's deposition at p. 48 for her allegation that Snow was in the parts room to accommodate a non-work-related illness, the court notes that p. 48 does not appear to contain such a statement.  Instead, Ford's testimony read:

Q: Do you ever recall Coy Snow being placed in the parts room?
A: I remember Coy working up there for a few days, yes.
Q: What do you recall?
A: If I'm not mistaken, I was on night shift at the time and I really don't know why he was in there.
Q: Do you know if he was able to lift anything over five pounds?
A: I don't know.  I don't know anything about the medical restrictions.

approximately a month due to his heart condition. Parks, plaintiff contends, has a latex allergy and was accommodated by being removed from evicerating to the box room, where is dry.[27] Additionally, plaintiff alleges: "Jenny Turner was accommodated because she was on blood thinners and placed in the paw room grading chicken paws where she would not work around knives."[28]

Plaintiff highlights Burdick's testimony that the 2002 turnover rate at the Heflin plant was 73% of the population of Tyson's workforce, reflecting that 210-215 employees were hired in that year. According to Burdick, the bulk of the Heflin plant's workforce works in evisceration, and some workers sit on stools to perform their jobs. In evisceration, there is no forklift driving, no lifting more than a chicken, and no ladder climbing. Burdick confirmed that it was against Tyson's policy for O'Neal to work while on leave. Burdick stated that working while on leave is potential grounds for termination.

On October 29, 2002, plaintiff filed her EEOC charge.[29] On August 6, 2003, plaintiff filed

---

[27] According to plaintiff, another employee named Helen Champion ("Champion") was moved from the box room to accommodate Parks's move to the box room. Champion is one of the subjects of plaintiff's motion for protective order. *See infra*. Champion's sworn declaration stated: "I work in the box room at Tyson, performing my regular job with no restrictions. At no time have I requested an accommodation from Tyson for any disability or provided Tyson with any documentation of a doctor's work restrictions, nor have I received any accommodation or special treatment because of a disability."

[28] Virginia Turner is one of the subjects of plaintiff's motion for protective order. *See infra*. The court assumes that Jenny Turner and Virginia Turner are one in the same.

Virginia Turner's sworn declaration stated that she suffers from lupus and as a result takes anti-coagulant medication on a regular basis. Virginia Tucker further stated: "Neither my doctor nor I have provided Tyson with any work restrictions based on my condition. In 1996, I was transferred to a job in the paw room. This was a normal job transfer, and was not related to my medical condition. I have not asked for any accommodation from Tyson because of my medical condition, and I have not received any special treatment because of it."

[29] The EEOC charge stated:

On February 6, 2002, I was forced to leave my place of employment to take maternity leave. I was able to perform my duties with restrictions which included no heavy lifting, climbing the ladder or operating the forklift. These were the same restrictions placed on me during a previous pregnancy and there was no undue hardship placed on my employer to my

14

the complaint against Tyson, alleging violations of the Pregnancy Discrimination Act, the Americans with Disabilities Act of 1990, and the Family and Medical Leave Act of 1993.[30]  According to plaintiff, Tyson "refused to allow Plaintiff to work due to her pregnancy, disability, or perceived disability."

In Count I (entitled "Title VII Sex/Pregnancy Discrimination"), O'Neal claims that on or about February 6, 2002, she was forced to take maternity leave despite the fact that she was approximately two and one-half months pregnant and still able to perform the essential functions of her job.  In that count, plaintiff alleges that while her physician-imposed restrictions in 2002 were identical to those of a previous pregnancy while employed with Tyson, in the first pregnancy plaintiff was able to and allowed to perform her duties as a parts clerk while in her second pregnancy, she was able to but not allowed to perform such duties.  O'Neal further alleges that after being forced to leave her job in February 2002, Tyson replaced her with an injured male worker.  Plaintiff asserts the following damages: "loss of pay; required to take and use up other benefits such as vacation and FMLA time; lost benefits and other advantages of employment; and ... mental anguish, shame,

_____

knowledge.  At the time I was asked to leave, I was performing duties in the Parts Room for the Maintenance Department.  This is the department that male employees are assigned when they are placed on light duty for any on the job injury or temporary illness.

I was called into the office of Carlos, Third Shift Human Resource Supervisor.  Also present were Rickey, 2nd Shift Maintenance Supervisor and Mike, Third Shift Maintenance Supervisor, and informed that I was being placed on parental leave of absence until the birth of my child and released by my doctor.

I believe that I have been discriminated against because of my Sex/Pregnancy which is in violation of Title VII of the 1964, Civil Rights Act, as amended.

This EEOC charge form, this court notes, contains a type note ("Amended charge - original charge filed July 5, 2002).  Plaintiff had previously sent the EEOC a typed letter stamped "received" by the EEOC on July 5, 2002.

[30] Since plaintiff's opposition to summary judgment states that she "voluntarily dismisses any claim pursuant to the Family and Medical Leave Act," the court will not consider plaintiff's FMLA claims.

humiliation, and other damages."

In Count II (entitled "Violation of the Americans with Disabilities Act"), plaintiff alleges that defendant "deprived [her] of her ability to work by virtue of disability or perceived disability in violation of the" ADA. Plaintiff further alleges: "Defendant considered plaintiff disabled by virtue of the limitations placed upon her by her physician related to pregnancy. Although she could perform the job without reasonable accommodations, Defendant would not allow her to work. However, Defendant allowed other workers with other conditions to have her job or to work in modified or light duty jobs. The restrictions placed on her did not prevent her from performing the essential duties of her job as the job is actually performed."

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141

16

(11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer,* 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.,* 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

## MOTION FOR SUMMARY JUDGMENT

**I.      Defendant's Motion**

**A.      PLAINTIFF'S TITLE VII (PDA) CLAIM FAILS AS A MATTER OF LAW AND DEFENDANT SHOULD BE GRANTED SUMMARY JUDGMENT AS TO THIS CLAIM.**

The PDA prohibits employment-related discrimination based on pregnancy, childbirth, or related medical conditions. *See* 42 U.S.C. § 2000e(k). The statute provides: "[W]omen affected by pregnancy, childbirth, or other related medical condition shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." *Id.* The analysis applied to pregnancy discrimination, defendant points out, is the same analysis used in other Title VII sex discrimination cases. *See Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312-13 (11th Cir.1994). Here, defendant argues, the McDonnell

17

Douglas/Burdine/Hicks burden-shifting analysis of Title VII discrimination cases applies.[31]  *See Hilburn v. Murata Electronics North America, Inc.*, 181 F. 3d 1220, 1226 (11th Cir. 1999).

Therefore, Tyson argues, O'Neal bears the burden of proving a *prima facie* case of pregnancy discrimination by a preponderance of the evidence. A prima facie case of pregnancy discrimination has the following four elements: (1) that plaintiff was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse affect on her employment; and (4) that she suffered from differential application of work or disciplinary rules. *See Armstrong* at 1314. At that point, defendant contends, the burden shifts to Tyson to produce a legitimate, nondiscriminatory reason for its employment decision. Such burden, Tyson asserts, has been described as exceedingly light such that the employer need only offer neutral reasons for its action, not prove them. *See Meeks v. Computer Assoc. Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994). Then, defendant contends, the burden shifts back to plaintiff to establish pretext. Despite the shifting burdens of proof, Tyson insists, the ultimate burden of persuasion remains at all times with plaintiff. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

According to defendant, the PDA does not require an employer to specially accommodate pregnant employees. Rather, defendant asserts, the PDA requires an employer to give pregnant employees the same opportunities and same benefits as non-pregnant employees who are similarly situated in their ability to work. *See Byrd v. Lakeshore Hospital*, 30 F.3d 1380, 1382 (11th Cir. 1994)("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded nonpregnant temporarily disabled employees.") If an employee's pregnancy actually prevents her from fulfilling the duties of her position, defendant

---

[31] O'neal argues that the Supreme Court's decision in *Desert Palace v. Costa* changed this test. *See infra.*

contends, the employer is not obligated to provide any preferential treatment. *See Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999)("The PDA does not require that employers give preferential treatment to pregnant employees"). Stated another way, Tyson argues, an employer is not required to accommodate a pregnant employee if the employer does not accommodate non-pregnant employees in comparable situations. *See Armstrong* at 1317; *Byrd* at 1382 n.3. Accordingly, Tyson contends, if an employer only provides accommodations to employees with on-the-job injuries and not to employees injured or temporarily disabled for other reasons, the employer is not required to provide accommodation to its pregnant employees. *See Spivey*, 196 F.3d at 1313 ("We therefore hold that an employer does not violate the PDA when it offers modified duty solely to employees who are injured on the job and not to employees who suffer from a non-occupational injury. Of course, pregnant employees must be treated the same as every other employee with a non-occupational injury").

## 1.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE BECAUSE SHE WAS NOT QUALIFIED FOR THE POSITION.

Plaintiff alleges that she was discriminated against in violation of the PDA when she was "forced" to take medical leave after her physician placed her on work restrictions because of her pregnancy and further claims that she was replaced by an injured male employee. According to defendant, O'Neal was not qualified for her position because her work restrictions prevented her from performing all the required duties of the parts room attendant.[32]   The undisputed evidence,

---

[32] Eleventh Circuit law provides: "For the purpose of employment discrimination cases, an employee is considered `qualified' for a position if he or she meets the criteria that the employer has articulated for the position." *See Wright v. Southland Corp.*, 187 F.3d 1287, 1300 n.16 (11t Cir. 1999)(internal citations omitted). Further, defendant contends, evidence of whether a particular function is essential includes the employer's judgment as to what functions of a job are essential and written job descriptions. *See e.g., Frix v. Florida Tile Indust., Inc.*, 970 F.Supp. 1027, 1034 (N.D.Ga. 1997).

Tyson insists, establishes that the parts room attendant position required the employee to "be able to lift 50 lbs. with no assistance,"[33] "be licensed to operate a forklift," and "conduct all physical inventories" which would necessarily require plaintiff to climb a ladder. (Pl. 244-49; DX20)

It is also undisputed, Tyson asserts, that O'Neal's January 2002 work restrictions prohibited her from operating a forklift, climbing a ladder, or lifting over 10 to 15 pounds. (Pl. 219; DX10) According to Tyson, plaintiff acknowledged that these restrictions prevented her from doing certain tasks required by her job and required adjustment to her job in order for her to continue working. (Pl. 152-56, 219) Plaintiff conceded that if she had not had any work restrictions, she would have been carrying items that weighed more than fifteen pounds and would have been climbing a ladder, probably on a daily basis, to reach items in the parts room that were above her immediate reach. (Id.) Finally, Tyson contends, plaintiff conceded that she would have operated the forklift if asked by her supervisor since she was the only hourly employee certified to operate a forklift on the third shift.[34] (Pl. 155-56) Since her medical restrictions prevented her from performing the essential functions required of a parts room attendant, Tyson argues, O'Neal was not qualified to perform this job while under the medical restrictions.

Despite O'Neal's insistence that Tyson should have allowed her to work under her restrictions as with her first pregnancy, Tyson repeats that it was under no legal obligation to make any special adjustments for O'Neal since the PDA does not require that employers give preferential treatment to pregnant employees. *See Spivey* at 1312. As such, defendant contends, plaintiff was

---

[33] By O'Neal's second pregnancy, defendant alleges, the written job description required a parts room attendant to be able to lift 75 pounds with no assistance. (DX 3)

[34] For the forklift-related testimony, *see supra* note 15.

not entitled to any accommodation to allow her to be qualified to perform her position.

### 2.   PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE BECAUSE SHE CANNOT ESTABLISH THAT SHE SUFFERED FROM DIFFERENTIAL APPLICATION OF WORK RULES.

Even if O'Neal could somehow establish that she was qualified for the position, Tyson

argues, she cannot establish the fourth element, i.e, that she suffered from a differential application

of work rules.  According to Tyson, O'Neal seeks a benefit of modified work duty or reassignment

to another position that was not provided to other employees with non-work related temporary

medical restrictions.   Under the new policy, Tyson insists, it provided modified work duty

assignments only to a clearly identified sub-group of workers - those injured on the job or having

ADA-qualifying disabilities.  Such a policy, Tyson contends, clearly does not violate the PDA. *See*

*Spivey* at 1312-13.

By Tyson's account, the court should reject as proper comparators the following individuals

who plaintiff believes were treated more preferentially than she was by Tyson because of her

pregnancy, i.e, (1) Mary Tucker, (2) Virginia "Ginny" Turner, (3) Helen Champion, (4) Tonya

Averitt, (5) Sherry Stephens, (6) O.K. Parks, (7) Scott Prater, and (8) Coy Snow.[35]  According to

Tyson, it is undisputed that Tyson's policies were applied equally to O'Neal and these employees.

### a.   Five of the Alleged Comparators Do Not Have Any Work Restrictions.

Five of the alleged comparators (Mary Tucker, Ginny Turner, Helen Champion, Tonya

Averitt, and Sherry Stephens), Tyson argues, did not have any work restrictions whatsoever during

---

[35] O'Neal has moved for a protective order pursuant to FRCP 37 to exclude any testimony or reference to the testimony of Tonya Averitt, Helen Champion, Louise Doss, Sherry Stephens, and Virginia Turner.  Such motion is discussed in detail *infra*.

the relevant time period. (Averitt Dec. 912; Turner Dec. ¶2-4; Champion Dec. 12; Stephens Dec. 912; Burdick Dec. 1115, 17-21).

Tucker suffers from osteoporosis.[36] (Burdick Dec. 15) However, Tucker works her regular job at Tyson, and she had never provided Tyson any doctor imposed work restrictions. (Burdick Dec. 15)

According to Tyson, Turner[37] takes anti-coagulant medication in connection with lupus, a disease that can be a disability under the ADA (again, Tyson argues, a permanent medical condition quite unlike pregnancy), and any alleged accommodation for that condition must be considered in that light. (Burdick 38; Burdick Decl. 17; Turner Decl. 2) However, Tyson points out, Turner stated in her affidavit that she has never provided Tyson with any work restrictions based on her medical condition and that she was transferred to a job in the paw room in 1996 as a routine job transfer unrelated to her medical condition. (Turner Decl. 2) Turner further stated that she has not requested any accommodation from Tyson because of her medical condition. (Burdick 38; Burdick Decl. 17; Turner Decl. 4)

Champion,[38] Tyson alleges, works in the box room at the Heflin plant without restrictions. (Burdick Decl. 121; Champion Dec. 12) Champion declared that she has not requested any accommodation from Tyson for any medical condition and she has not provided Tyson with any documentation of a doctor's work restrictions. (Champion Dec. 12)

_____

[36] Furthermore, Tyson argues, osteoporosis can be considered a disability under the ADA (in other words, a permanent medical condition quite unlike pregnancy), and asks the court to consider any alleged accommodation for that condition in that light.

[37] Again, plaintiff has moved for a protective order regarding Turner's declaration.

[38] Again, plaintiff has moved for a protective order regarding Champion's affidavit testimony or references to it. *See infra.*

Because Tucker, Turner, and Champion have never provided documentation to Tyson of medical work restrictions and have never requested any kind of accommodation from Tyson for a medical condition, Tyson argues, none of these employees is a proper comparator for plaintiff's claims.[39]

Turning to Averitt and Stephens,[40] Tyson alleges, plaintiff has alleged that these female employees were pregnant yet, unlike plaintiff, were permitted by Tyson to continue working at Tyson. (Pl. at 207-209[41], 326-28) However, Tyson argues, the undisputed evidence clearly shows that neither of these employees was placed on any work restrictions during their pregnancy. (Burdick 1; Burdick Decl. 18-20; Averitt Dec. 2; Stephens Dec. 2) Averitt stated that she became pregnant in 2001 and continued to work her regular duties without any restriction until she went on medical leave on June 2, 2002. (Averitt Dec. 12) Stephens testified that she became pregnant in 2001 and continued to work her regular duties without any restriction until she went on medical leave on July 1, 2002. (Stephens Dec. 912) O'Neal conceded that if these employees did not have work restrictions, their situations would be different from hers and that Tyson would not have been treating her differently than it treated these employees. (Pl. 209, 329)

---

[39] In her deposition, O'Neal expressed the belief that Turner was transferred to the "paw room" and out of the evisceration department so that she would not have to work about knives and other running machinery. (Pl. 231-32). However, Plaintiff testified that any alleged "transfer" occurred before the January 2002 policy change (and is thus inapplicable to Plaintiff's situation in 2002). (Pl. 234). According to Tyson, plaintiff's true complaint is that Tyson allowed Turner to continue to work in the paw room after the policy change in 2002. (Pl. 238) Plaintiff believes that Turner should have been put on leave in January 2002 when the policy changed. (Pl. 242) However, the law does not require employers to retroactively apply new rules to employees and rescind any accommodation provided under former policies.

[40] Plaintiff has also moved for a protective order regarding these employees' affidavits. However, the court does not see where plaintiff even relies on these individuals as comparators in her opposition to summary judgment.

[41] However, this court notes, pp. 207-09 from plaintiff's deposition appear to refer to a Ms. Parks and Ms. Ray only. The other pages appear to be correctly cited.

### b.   Two of the Alleged Comparators Suffered from On-The-Job Injuries.

According to Tyson, employees O.K. Parks ("Parks") and Scott Prater ("Prater")[42] suffered

from on-the-job injuries resulting in medical restrictions that Tyson was accommodating under the

policy. Plaintiff testified that she believed that Parks was working "in eviscerating and she is allergic

to latex gloves and the water and the gloves was breaking her out." (Pl. 204) She further stated that

Tyson "took her [Parks] out of the eviscerating and put her in the box room where it's dry." (Id.)

However, Tyson argues, the undisputed evidence establishes that Parks was reassigned to the box

room as a result of her on-the-job injury under Tyson's workers compensation policy. (Burdick

40-41; Burdick Decl.116)

O'Neal stated that Prater lost the tips of two of his fingers while working on-the-job in the

Heflin plant. (Pl. 340-41) According to Burdick, Prater was allowed to work with his restrictions

resulting from this on-the-job injury and also according to Tyson's worker's compensation policy.

(Burdick 3; Burdick Decl.11)  Tyson highlights plaintiff's admission that an employee with a

work-related injury cannot be compared to her situation when she suffered a non-work-related

medical condition. (Pl. 341) As such, Tyson argues, plaintiff did not suffer from a differential

application of work rules with regard to employees Parks and Prater.

Turning to Coy Snow ("Snow"), Burdick stated that Tyson placed Snow on a leave of

absence from June 27, 2001 until July 18, 2001 because of restrictions (no lifting over 20 pounds)

associated with a non-work-related temporary medical condition, in accordance with Tyson's

pre-January 2002 policy.

---

[42] It does not appear to the court, based on a review of her submissions in opposition to summary judgment, that plaintiff is relying on Prater as a comparator,

Snow was on leave again from work from August 1, 2002 to August 21, 2002, Tyson alleges, and then returned with a schedule limitation of only eight hours per day. (Burdick Decl.14) According to Burdick, Tyson adjusted his work schedule and applied the missed work time to intermittent FMLA leave. (Id.)  Burdick stated that Snow could perform the essential functions of his job and needed only a schedule change. (Id.)  Snow returned to a regular full schedule as of September 18, 2002. (Id.)  According to Tyson, Snow's schedule limitation was different from plaintiff's job-function restrictions under the January 2002 leave policy because he could perform all of the essential functions of his position.  Just like O'Neal, Tyson argues, Snow was placed on leave for the time period requiring accommodation – only that time period was for several hours each day.

Thus, Tyson contends, O'Neal has failed to establish that she suffered a disparate application of Tyson's medical leave policy.

**B.    EVEN ASSUMING ARGUENDO THAT PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE, SHE FAILS TO REBUT DEFENDANT'S LEGITIMATE, NONDISCRIMINATORY REASON FOR THE EMPLOYMENT DECISION.**

Tyson highlights its January 2002 policy during plaintiff's second pregnancy, which did not allow for any special arrangements for a pregnant employee with work restrictions that prevented the employee from performing the duties of her job but rather treated pregnancy-related restrictions the same as other non-work-related injuries or medical conditions resulting in work restrictions. (Burdick 21-22; DX 9; Pl. 188, 193) Again, Tyson reiterates, plaintiff's restrictions prevented her from performing duties required of the parts room attendant. (Pl. 152-56) Plaintiff acknowledged that in 2002 she would have required a modified work assignment not because she was pregnant, but

25

because of her medical restrictions. (Pl. 340)  Tyson concludes: "Plaintiff has failed to present a single piece of evidence to discredit Tyson's legitimate and nondiscriminatory reason for her leave of absence in 2002."

### B.   PLAINTIFF'S ADA CLAIM[43] FAILS AS A MATTER OF LAW AND DEFENDANT SHOULD BE GRANTED SUMMARY JUDGMENT AS TO THIS CLAIM.

#### 1.   PLAINTIFF'S ADA CLAIM IS OUTSIDE THE SCOPE OF HER EEOC CHARGE AND MUST BE DISMISSED AS A MATTER OF LAW.

Indisputably, Tyson contends, filing an EEOC charge is a condition precedent to a Title VII civil action, *see* 42 U.S.C. § 2000e-5(e), and such charge must be filed with the EEOC within 180 days of the alleged discriminatory action. *Id.*  The ADA, Tyson argues, has incorporated the EEOC administrative prerequisite provisions contained in Title VII.  *See* 42 U.S.C. §12117.  "If an employee fails to file an EEOC charge before the 180-day limitations period elapses, his or her subsequent lawsuit is procedurally barred and must be dismissed for failure to exhaust his or her administrative remedies." *See Brewer v. Alabama*, 111 F. Supp. 2d 1197, 1204 (M.D.Ala. 2000); *Everett v. Cobb County School Dist.*, 138 F.3d 1407, 1410 (11th Cir. 1998).  Further, Tyson argues, the scope of any subsequent judicial proceeding is limited to allegations raised in the charge "or those that can be reasonably expected to grow out of the charge of discrimination." *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988)(internal quotations omitted); *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) (finding that an EEOC Charge regarding unequal pay and resulting investigation would not trigger an inquiry into defendant's

---

[43]  The complaint alleges that Tyson "deprived plaintiff of her ability to work by virtue of disability or perceived disability in violation of the Americans with Disabilities Act" and that  Tyson regarded plaintiff as disabled because of the work restrictions placed upon her by her physician because of her pregnancy.

promotion practices). Here, Tyson asserts, O'Neal's ADA claim is barred because she failed to include it in her EEOC charge and did not even check the "DISABILITY" box on the charge. (Id.)

### 2.     PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE BECAUSE SHE IS NOT "DISABLED" AS DEFINED BY THE ADA.

The ADA defines "disability" as a "physical or mental impairment that substantially limits one or more of the major life activities of such individual..." 42 U.S.C. § 12102(2)(A). "Disability" is one of the following: "(A) a physical or mental impairment that substantially limits one of more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(2). An individual is considered disabled, Tyson argues, only if she meets one of these three definitions. *See Gordon v. E. L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Here, Tyson argues, O'Neal cannot establish that her temporary physical impairments related to pregnancy substantially limited a major life activity.

To qualify as disabled under subsection (A) of the ADA's definition of disability, Tyson points out, a plaintiff must initially prove that she has a physical or mental impairment. *See* 42 U.S.C. § 12102(2)(A). A physical impairment standing alone is not necessarily a disability as contemplated by the ADA. *See Dutcher v. Ingalls Shipbuilding*, 53 F. 3d 723, 726 (5th Cir. 1995). Instead, Tyson emphasizes, the ADA requires an impairment that substantially limits one or more of the major life activities. *Id.*

While the ADA fails to define "major life activities" or "substantially limits," defendant argues, EEOC regulations provide guidance. *See* 42 U.S.C. § 12116 (mandating that the EEOC issue such regulations). These regulations provide that "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,

27

and working." *See* 29 C.F.R. § 1630.2(i). Furthermore, Tyson notes, the regulations define "substantially limits" as being "unable to perform a major life activity" or "significantly restricted as to the condition, manner or duration" in which one performs a major life activity. *See* 29 C.F.R. § 1630.2(j)(1)(i)-(ii). According to Tyson, the regulations instruct courts to consider the following three factors when determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment. *See* 29 C.F.R. § 1630.2(j)(2).

Defendant relies upon *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194-203 (2002), in which the Supreme Court recently addressed the question of what a plaintiff must demonstrate in order to establish a "substantial limitation" of a "major life activity." The *Toyota* court held that "to be substantially limiting in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198. According to Tyson, the majority of courts interpreting this aspect of the *Toyota* decision have concluded that this analysis applies regardless of the specific class of major life activity one is claiming.[44] *See Fenney v. Dakota, Minnesota & Eastern R. Co.*, 327 F.3d 707, 715 (8th Cir. 2003); *Mack v. Great Dane Trailers*, 308 F.3d 776, 781 (7th Cir. 2002)("We see no basis for confining Toyota's analysis to only those cases involving the specific life activity [of performing manual tasks].") *Stedman v. Bizmart, Inc.*, 219 F.

---

[44] The Supreme Court, Tyson argues, has specifically stated that a different analysis is required for the major life activity of working. Moreover, Tyson contends, plaintiff's testimony forecloses any claim that she is substantially limited in the major life activity of working. *See Toyota*, 534 U.S. at 199-200; *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999).

28

Supp.2d 1212, 1221 (N.D. Ala. 2002).

Tyson deems meritless plaintiff's claims of having a physical impairment that substantially limits one of more of her major life activities or of Tyson having regarded her as having such an impairment, *see* Complaint ¶¶12-13.

> a.   **Plaintiff Cannot Demonstrate that She Has a Physical or Mental Impairment that Substantially Limits One or More of Her Major Life Activities.**

According to Tyson, most courts have held that pregnancy (absent very serious complications) is not a disability as defined by the ADA.[45]   Tyson highlights EEOC guidelines stating that "other conditions, such as pregnancy, that are not the result of a physiological disorder are also not impairments" under the ADA.  *See* 29 CFR §1630.2(h).  The EEOC also notes that "[a]lthough other statutes may use the term `disability' when referring to pregnancy, pregnancy is not a `disability' for purposes of the ADA."  *See* EEOC Compliance Manual § 915.002 at 902-9 n.10.  Thus, Tyson argues, O'Neal's pregnancy clearly does not constitute a disability as defined by the ADA.

Moreover, Tyson asserts, O'Neal cannot establish that her pregnancy, which was by nature temporary, substantially limited one or more of her major life activities.  "[A] temporary impairment ... will generally not qualify as a disability under the ADA.  An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time."  *See Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462 (4th Cir. 2002).

---

[45] *See Wenzlaff v. Nationsbank*, 940 F. Supp. 889 (D.Md.1996)("With near unanimity, federal courts have held that pregnancy is not a `disability' under the ADA"); *Johnson v. A.P. Prods., Ltd.*, 934 F.Supp. 625 (S.D.N.Y 1996)(neither plaintiff's "pregnancy nor its complications are a disability under the ADA"); *Gudenkauf v. Stauffer Communic., Inc.*, 922 F.Supp.465 (D.Kan. 1996)("pregnancy and related medical conditions do not, absent unusual circumstances, constitute a `physical impairment' under the ADA. Accordingly, pregnancy and related medical conditions are not `disabilities' as that term is defined by the ADA.").

Further, Tyson asserts, the only major life activity in which O'Neal could possibly claim that she was "substantially limited" in would be working.[46] The United States Supreme Court has stated that when the activity is working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills ... are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different jobs are available, one is not precluded from a broad range of jobs." Sutton, 527 U.S. at 492. With respect to the major life activity of working, the term "substantially limits" means:

> [S]ignificantly restrict[s] [his or her] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

See 29 C.F.R. § 1630.2(j)(3)(i). See also Sutton, 527 U.S. at 492("the statutory phrase `substantially limits,' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs"); Murphy v. United Parcel Serv., Inc., 119 S.Ct. 2133, 2138 (1999)("to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job").

According to Tyson, O'Neal cannot establish that she is precluded from working in a broad range of jobs. Defendant argues that O'Neal's insistence that she was able to do her job as the parts room attendant, as it was actually performed, see Pl. 147-50, precludes her from arguing that she was significantly limited in working. See Standard v. A.B.EL. Services, Inc., 161 F. 3d 1318, 1327 (11th

---

[46] Tyson points out that the Supreme Court reserved the question of whether working could be considered a major life activity. See Toyota Motor Mfg., Ky., Inc., 534 U.S. at 200; Sutton at 492; see also Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1216 at n. 2 (11th Cir. 2004). For summary judgment purposes only, however, defendant deems working a viable major life activity.

Cir. 1998) (holding that when plaintiff with back injury testified that he was fully capable of performing his job at all times during his employment, he could not be considered disabled under the ADA).

### b. Plaintiff Cannot Demonstrate that Defendant Regarded Her As Disabled.

"Under the 'regarded as' prong of the ADA, a person is 'disabled' if her employer perceives her as having an ADA-qualifying disability, even if there is no factual basis for that perception." *See Carruthers*, 357 F.3d at 1216.24. A person is "regarded" as having an impairment if:

> [she] has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or [has no physical or mental impairment] but is treated by an employer has having such an impairment.

*See Sutton v. Lader*, 185 F.3d 1203, 1208 (11th Cir. 1999)(*quoting* 29 C.F.R. § 1614.203(a)(5)); *see also Murphy* ("A person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities"). According to Tyson, a plaintiff pursuing a "regarded as" theory of disability must show that the impairment was perceived to substantially limit her ability to perform one or more major life activities. *See Standard* at 1327. In *Carruthers*, Tyson argues, the plaintiff admitted that her employer's knowledge of her medical condition was limited to her physician's diagnosis of a bilateral strain/sprain and her work restrictions. The only other evidence the *Carruthers* plaintiff offered to support her claim that her employer perceived her as disabled was that she was informed that she would be terminated if she did not maintain a full-time schedule and her employer placed

31

an advertisement for her replacement shortly after learning of her inability to perform the basic tasks of her position. Based on this evidence, Tyson notes, the court held that "no reasonable jury could find that [the plaintiff's] evidence established that [her employer] perceived her impairment as one that substantially limited [a major life activity]" *Id.*

In the instant case, Tyson contends, it is undisputed that the only information Tyson had regarding O'Neal's medical condition were the medical restrictions from her personal physician of no forklift operation, no ladder climbing, and no lifting of weight over ten to fifteen pounds. (Pl. 144-45; DX10) From this limited information, Tyson argues, a reasonable jury could not conclude that Tyson perceived her to be substantially limited in a major life activity.  Instead, Tyson asserts, the evidence shows that Tyson thought only that plaintiff was unable to perform the essential functions of the parts room attendant position for a limited period of time, due to these medical restrictions provided by her physician, and did not perceive plaintiff's medical impairments as substantially limiting any major life activity.  *See McGeshick v. Principi*, 357 F.3d 1146, 1150-51 (10th Cir. 2004)(holding that, as the plaintiff's evidence about the employer's perception of his limitation was limited to confined concerns about the plaintiff's ability to perform specific tasks unique to his position, he could not establish that his employer perceived him as disabled);[47] *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)("An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general").

---

[47] This court observes that *McGeshick* also found significant the fact that plaintiff's supervisor invited him to apply for other jobs with the defendant.

32

Moreover, Tyson asserts, the fact that Tyson returned O'Neal to her PRA position as soon as these medical restrictions were lifted belies any "regarded as" claim. *See e.g., Borgialli v. Thunder Basin Coal Co.*, 235 F.3d 1284, 1290 (10th Cir. 2000)(finding that an employer's invitation to return casts doubt on whether the company considered the employee disabled under the ADA). Finally, Tyson argues, even if Tyson did perceive O'Neal as impaired because of her restrictions, plaintiff cannot establish that any of her temporary impairments (perceived or otherwise) actually limited substantially her ability to perform any major life activity. *See Carruthers*, 357 F.3d at 1216 ("As with actual impairments, however, the perceived impairment must be one that, if real, would limit substantially a major life activity of the individual").[48]

### 3.    PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF ADA DISCRIMINATION BECAUSE SHE CANNOT ESTABLISH THAT SHE IS A "QUALIFIED INDIVIDUAL WITH A DISABILITY" AS DEFINED BY THE ADA.

Additionally, Tyson argues, O'Neal has failed to prove that she is a "qualified individual" with a disability. Tyson highlights the ADA's definition of "qualified individual" as "one who, with or without reasonable accommodation, can perform the essential functions of the employment position that such person holds or desires." *See* 42 U.S.C. §12111(8). According to defendant, plaintiff bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation.[49] *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990). It is undisputed, Tyson asserts, that O'Neal's work restrictions prohibited forklift operation, climbing a

---

[48] Tyson asserted this argument above.

[49] "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." *Frix*, 970 F.Supp. at 1034 (*quoting* 29 CFR § 1630.2(n)(1996)). "Evidence of whether a particular function is essential includes (1) `the employer's judgment as to what functions of a job are essential; (2) written job descriptions prepared in a timely manner; (3) the amount of time spent on the job performing the particular function; and (4) the consequences of not requiring the job holder to perform the function." *Id.* (*quoting* 42 U.S.C.A. § 12111(8); 29 CFR § 1630.2(n)(3)(1996)).

ladder, or lifting over 10 to 15 pounds.  Again, Tyson highlights O'Neal's testimony that these restrictions prevented her from doing certain tasks required by her job.  Tyson argues: "Because Plaintiff's medical restrictions prevented her from performing the essential functions of the parts room attendant position, she was not qualified to perform this job while under the medical restrictions."[50]

Finally, Tyson argues, plaintiff fails to establish a prima facie ADA discrimination claim because she offers no evidence of any discriminatory intent.  *See Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)(finding that a fundamental requirement in all employment discrimination claims is proof of an employer's discriminatory intent).  Here, Tyson argues, O'Neal offered no evidence that any decision-maker or other Tyson employee harbored any discriminatory intent towards her because of her alleged disability.

>    **d.**   **EVEN ASSUMING ARGUENDO THAT PLAINTIFF CAN ESTABLISH A PRIMA FACIE CASE UNDER THE ADA, DEFENDANT TYSON IS DUE SUMMARY JUDGMENT BECAUSE PLAINTIFF FAILS TO REBUT TYSON'S LEGITIMATE NONDISCRIMINATORY REASONS FOR ITS EMPLOYMENT DECISIONS.**

In order to survive summary judgment, Tyson asserts, O'Neal must present evidence to prove that 1) the legitimate, nondiscriminatory reasons provided by Tyson for its employment decisions

---

[50] Additionally, Tyson argues, O'Neal's assertion that she could have been accommodated with a transfer fails because she provides no evidence of a vacant position that existed at the time that she was qualified to perform. According to Tyson, a transfer may be a reasonable accommodation but only "provided that a vacant position exists at or below the level of plaintiff's prior position which [the plaintiff] is qualified to perform with or without reasonable accommodation." *See Shafinsky v. Bell Atlantic, Inc.*, 2002 WL 31513551 at * 6 (E.D. Pa. 2002). Further, in order for a transfer to constitute a possible reasonable accommodation, a vacancy must exist at the time of the request. *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. § 1630.2(o)(2)(ii). "The reassignment duty ... does not require the employer to bump another employee from a position in order to accommodate a disabled employee. Nor does it require the employer to promote a disabled employee." *See Lucas v. W. W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)(internal citation omitted).

are false, and 2) intentional disability discrimination is the real reason for the decision.[51]  *See St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515 (1993).  Tyson asserts that O'Neal has not met her burden of proof or ultimate burden of persuasion that disability discrimination was the motivating factor behind any employment decision made by Tyson.

According to Tyson, plaintiff has offered no evidence to rebut that Tyson was following its lawful and legitimate leave of absence policy when it placed plaintiff on medical leave in January 2002.  Tyson concludes: "Plaintiff has wholly failed to produce substantial evidence from which a reasonable jury could conclude this legitimate nondiscriminatory reason for placing plaintiff on a medical leave of absence in January 2002 was a pretext for disability discrimination."

## II.    Plaintiff's Response

### A.    LEGAL STANDARD FOR SUMMARY JUDGMENT

As an initial matter, plaintiff asks this court to consider the proper burden of proof in employment discrimination cases at the summary judgment stage in light of *Desert Palace v. Costa*, 123 S.Ct. 2148 (2003).  O'Neal points out that a plaintiff may defeat summary judgment by either (1) producing "direct evidence of discrimination or [2] through circumstantial evidence that creates an inference of discrimination." *See Bass v. Board of Cty. Com'rs*, 256 F.3d 1095 (11th Cir. 2001).  After noting the existence of the *McDonnell-Douglas* burden-shifting framework, with which this

---

[51] Defendant relies on *Davis v. AT&T*, 846 F. Supp. 967, 969 (M.D. Fla. 1993), which requires plaintiff to present "concrete evidence in the form of specific facts" demonstrating pretext. *Davis* stated that the plaintiff cannot simply "rely on the possibility that the jury might infer a discriminatory motive." Furthermore, defendant notes, the 11th Circuit held: "In an employment discrimination case, the plaintiff must produce sufficient evidence to support an inference that the defendant-employer based its employment decision on an illegal criterion." *See Benson v. Tocco, Inc.*, 113 F.3d 1203, 1207 (11th Cir. 1997). "Thus, the relevant inquiry regarding summary judgment is whether a reasonable person could infer discrimination *based on the facts presented*, assuming those facts were to remain unrebutted." *Biggs v. State of Fla. Bd. of Regents*, 1998 WL 1069456 at *7 (N.D. Fla. Oct. 28, 1998)(emphasis in original).

court is familiar, plaintiff recites the effect of the "pretext" stage as follows: "[D]espite the general presumption against using summary judgment to resolve the largely factual questions concerning discriminatory intent, it is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment [might be] warranted." *See Brown v. Am. Honda Motor Co., Inc.*, 939 F.2d 946 (11th Cir. 1991).

According to O'Neal, once upon a time the only alternative to McDonnell-Douglas was the Price Waterhouse v. Hopkins test. *See* 490 U.S. 228, 269-70 (1989). In *Price Waterhouse*, O'Neal notes, a plurality determined that "mixed-motive" cases, cases where the jury could determine that an employer's adverse action was only part-discriminatory, required a different test than "single-motive" cases. Instead of requiring adherence to McDonnell-Douglas, Price Waterhouse allowed the employer to show only that it would have made the same decision regardless of the plaintiff's membership in a protected class.

The Civil Rights Act of 1991, plaintiff argues, changed the effect of Price Waterhouse and McDonnell Douglas because plaintiffs could satisfy their burden of proof by demonstrating that discrimination "was a motivating factor for any employment practice"; employers were only allowed a defense if they proved that they "would have taken the same action in the absence of the impermissible motivating factor." *See* 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B).

Desert Palace, plaintiff contends, articulates this result. *Desert Palace* involved a "mixed-motive" scenario whereby plaintiff produced circumstantial evidence that she was disciplined by her employer because she was a woman, but the employer produced undisputed evidence of a legitimate reason for treating her different than her male counterpart, i.e, she had a previous record of disciplinary problems while he did not. *Desert Palace* held that a plaintiff need

36

not offer direct evidence of discriminatory motive to proceed under a "mixed-motive" analysis and that "no heightened showing is required." Slip Op., p. 10. According to the court, the plaintiff's circumstantial evidence created a fact issue as to whether sex was "a motivating factor" in the employment decision; the employer was entitled to a defense that it would have taken the same action in the absence of the impermissible motivating factor, but the Court held that it bore the burden of proof on that issue. *See Id.* at pp. 7-8. The Supreme Court emphasized the important role of circumstantial evidence in discrimination cases.

Although the Supreme Court did not explicitly consider the 1991 amendment's effect outside of the "mixed-motive" context, plaintiff argues, "its decision leaves no room for any conclusion other than it eviscerated the McDonnell-Douglas test as well." According to O'Neal, McDonnell-Douglas turns every "single-motive" case into a "mixed-motive" one. Whenever the plaintiff makes a prima facie case of discrimination and the employer articulates a non-discriminatory reason for the employment action, O'Neal argues, there are potentially at least two motives for the decision; therefore, the jury could consider the case to be a "mixed motive" case, regardless of its label. Like the Price Waterhouse "direct evidence" requirement, O'Neal contends, the McDonnell-Douglas "pretext" requirement imposes an additional burden on the plaintiff not authorized by the 1991 amendment.

Furthermore, plaintiff asserts, Desert Palace is more useful than McDonnell-Douglas. Plaintiff argues:

> Once plaintiff establishes questions of fact that discrimination was a "motivating factor" in the employment decision by presenting circumstantial evidence of a prima facie case and the employer presents a nondiscriminatory reason for the employment action, there is an issue of fact for the jury to decide and the dichotomy is

37

complete. Either the jury will accept plaintiff's evidence that an illegitimate factor was a "motivating factor" in the decision or defendant's evidence that it based its decision solely on its legitimate reason. However, the third "pretext" stage of *McDonnell Douglas* turns the 1991 amendment on its head; instead of allowing a case where discrimination was a motivating factor to go to the jury, the plaintiff must prove exactly the opposite -- that the employer's reason was wrong and discrimination was the only factor. *Desert Palace* teaches that this result is incomplete, illogical, and prohibited by the Civil Rights Act of 1991.

In practice, plaintiff contends, few employment decisions are made solely based on one basis but are instead the result of the interaction of various factors, "legitimate and illegitimate, objective and subjective, rational and irrational." In Desert Palace, plaintiff argues, the Supreme Court effectively halted the legal fiction that there is only one reason for employment decisions. According to O'Neal, a plaintiff's unsuccessful challenge to the employer's non-discriminatory rationale should not automatically allow the employer to escape liability if discrimination was only part, but still a "motivating factor" for the decision.

Plaintiff relies upon Dare v. Walmart Stores, Inc., 267 F. Supp. 2d 987 (D. Minn. 2003) as authority for the foregoing rationale. *Dare* held that the McDonnell-Douglas framework no longer applies in a summary judgment analysis in either a "single motive" or "mixed-motive" case and instructed courts to follow Desert Palace and determine whether a plaintiff has produced sufficient circumstantial evidence where "a reasonable jury [could] conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" By O'Neal's account, this holding is consistent with previous Eleventh Circuit pronouncements that McDonnell-Douglas is no longer important when the case reaches the jury. See Alexander v. Fulton County, 207 F.3d 1303, 1334-1335 (11th Cir. 2000).

38

In the instant case, plaintiff contends, Tyson has argued that its employment decisions are adequately explained by factors other than pregnancy and disability law, thereby triggering <u>Desert Palace's</u> "mixed-motive" analysis.   Although O'Neal contends that she meets the McDonnell-Douglas "pretext" requirement, even if she didn't, O'Neal asserts, <u>Desert Palace</u> precludes the entry of summary judgment in defendant's favor.

**B.    PLAINTIFF'S TITLE VII (PDA) CLAIM DOES NOT FAIL AS A MATTER OF LAW AND DEFENDANT SHOULD NOT BE GRANTED SUMMARY JUDGMENT AS TO THIS CLAIM.**

**1.    <u>Plaintiff Can Establish a Prima Facie Case Because She Was Qualified for the Position</u>.**

O'Neal states the following elements of a prima facie case of pregnancy discrimination: (1) that she was a member of a protected class; (2) that she was qualified for her position; (3) that she suffered an adverse effect on her employment; and (4) that she suffered from differential application of work or disciplinary rules. *See Armstrong*, 33 F.3d at 1314.  O'Neal asserts that she indisputably meets the first and third criteria as she was pregnant and was forced to accept a lay off without pay to keep her permanent position with Tyson.  O'Neal highlights Burdick's statement that acceptance of a position with another company, while leaving would subject her to potential termination under Tyson's leave policy.  Thus, O'Neal argues, she had "no choice but to go home, accept her disability payments, and when this money expired, to go without."

Defendant's sole contention that plaintiff was not "qualified," O'Neal contends, is based on the fact that O'Neal voluntarily and without knowledge of a policy change provided a doctor's excuse with the same medical restrictions as during her first pregnancy.  While defendant contends that these doctor's restrictions on O'Neal meant that she could not meet the "required duties" of the

39

position, plaintiff asserts, Burdick stated that a "temporary disability and maternity work permit" was no longer used as part of the new policy. (Burdick dep., p. 52). Thus, O'Neal argues, an obsolete form was used to lay plaintiff off.[52]

To determine whether O'Neal was qualified for the part room attendant job, plaintiff argues, the court should determine what the essential functions of that job were. ADA regulations define the term "essential functions" as "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Factors in determining whether a job function is "essential" include but are not limited to considering whether or not: (1) the function is the reason the position exists; (2) only a limited number of employees are available to perform the

---

[52] Specifically, Burdick testified as follows:

Q: Was the previous form – and I'm showing you Plaintiff's Exhibit 8.  Was that form entitled "temporary maternity and disability work permit"?
A: I'm not aware if it was or was not.
...
Q: ...[D]o you recognize Plaintiff's Exhibit 9...?
...
A: Yes, I do.  Yes.
Q: Can you tell me why on Plaintiff's Exhibit 9 that document reads "disability/maternity work permit" and Plaintiff's Exhibit 8 is "temporary disability work permit"?
A: I couldn't tell you why, no.  I do not know.
Q: Was a pregnant worker required to have Plaintiff's Exhibit 8 completed by their physician to continue working?
A: In 2002?
Q: No.
Q: Previous to 2002, was a pregnant worker required to have Plaintiff's Exhibit 9 completed?
A: To my knowledge, yes.  This was a nursing policy.
...
Q: If a work permit was not required per the policy, Plaintiff's Exhibit 4 that went into effect on January 1, 2002, why was Ms. O'Neal required to get a work permit from her doctor, Plaintiff's Exhibit 8?
A: My understanding of what took place was that Tracy presented at the nurse's station and told them that she was pregnant and needed a disability permit.  And the nurse that was there was a part-time nurse that was filling in and wasn't sure what he or she needed to do – I'm not sure if it was a he or she....  They went to the book, pulled this our from her definition of what she was requesting and gave that to her and completed it based on what was in her previous file.  I think it was a misunderstanding.
Q: Should never have been completed then, per the new policy?
A: That's correct.

function; or (3) the function is highly specialized. *Id.* at § 1630.2(n)(2). Regulations provide that following criteria to determine whether or not a job function is "essential:" (1) the employer's judgement as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring an incumbent to perform the function; (5) the work experience of past incumbents in the job; and (6) the current work experience of incumbents in similar jobs. *Id.* at § 1630.2(n)(3).

O'Neal highlights Ford's testimony regarding her qualifications and her need to go to human resources for questions about the new policy.[53]   Again, plaintiff insists, her physician-imposed restrictions did not prevent her from doing the job that she had performed for three years.  Further, O'Neal argues, the written job description relied upon by Tyson (Pl.'s Exhs. 3, 20) does not list the essential duties or requirements but merely duties the "position involves," while leaving blank a space labeled "requirements for the position."

Additionally, O'Neal asserts, Tyson voluntarily modified the job description, failing to enforce the policy that the door to the parts room remain closed and that parts be handed over a counter. Contrary to that policy and with the acquiescence of the supervisors, O'Neal points out, maintenance men and supervisors regularly entered the parts room and got what they needed. (Ford dep., p. 80; Nappier dep., pp. 29-30).  Often they were in a hurry to obtain the part and other times it was difficult to describe what it was that was needed. *See* Ford dep. at 32-33; 38-40.  Only after plaintiff announced her pregnancy and defendant mentioned the liability of a pregnant woman and her child in the workplace, O'Neal argues, did Tyson use the job description to send plaintiff home.

---

[53] Facts relating to this issue have been discussed earlier in this memorandum opinion.

According to plaintiff, she had been performing computer work and preparing the department for the new inventory system, SAP, that was to go into operation in November 2002. After she was placed on leave without pay, O'Neal contends, the parts room was left unattended, inventory was not maintained on the computer, and the maintenance men came and want as needed.

### 2. Plaintiff Can Establish a Prima Facie Case Because She Can Establish that She Suffered from Differential Application of Work Rules.

The PDA, plaintiff argues, mandates equal treatment with regards to non-work related injured workers. Plaintiff recites the facts of *Armstrong v. Flowers Hosp.*, 33 F.3d 1308 (11th Cir. 1994). In that case, a pregnant nurse brought suit when she was fired by her employer for refusing to treat a HIV-positive patient. While the *Armstrong* plaintiff argued that her employer was required by the PDA to provide her with "alternative work" that she claimed would be safer for her fetus, the Eleventh Circuit rejected this argument, reasoning that the language of the statute does not address whether employers are required to give favorable treatment to pregnant employee but that legislative history "make[s] it clear that the PDA does not require employers to extend any benefit to pregnant women that they do not already provide to other disabled employees." *Id.* at 1316-17.

In support of its holding, O'Neal points out, the panel cited *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737-39 (7th Cir.1994) for the following: "While the PDA requires the employer to ignore the pregnancy, the employer need not ignore absences, unless the employer likewise ignores the absences of nonpregnant employees." *Id.* at 1317. According to O'Neal, this rationale is particularly pertinent in this case. O'Neal accuses defendant of treating "the lone pregnant female in the parts room" differently than other workers in the parts room with non-work related injuries and illnesses, who were allegedly accommodated in direct violation of the PDA.

42

Plaintiff highlights Ford's testimony that Louise Doss has high blood pressure and does not climb a ladder other than a three foot step ladder or lift any tool heavier than seven or eight pounds. If a maintenance man needed a heavier part when Doss was attending the parts room, Ford stated, he would enter the department and get it. Ford further testified that "at that time [2001 - 2003] it [walking into the part's room to retrieve a tool or part] was pretty common for everybody." (Ford dep., p. 32, ln. 16-17). According to Ford, the procedure has now changed where you go to the counter and ask for the part, but maintenance men and others still go in and get the part they need. (Ford dep., p. 33, ln. 6-19). Ford acknowledges that if a part is too heavy the part's room technician can open the door and tell the maintenance man to get the part himself. Ford has never disciplined anyone for allowing someone to get a heavy part or for not keeping the door locked. (Ford dep., p. 41, ln. 18 - p. 42, ln. 8). Additionally, Ford stated, he has never required a part's room technician to lift seventy- five pounds unassisted. (Ford dep., p. 38, ln. 4-7; p. 73, ln. 21 - p.74, ln. 1). Plaintiff stated it was sometimes once a week that she would lift 50-75 pounds. (Pl.'s dep., p. 253). Plaintiff further stated that it was minimal that she lifted 15-50 pound parts. Id. at 254. During the time of plaintiff's leave for her second pregnancy, Ford testified, the maintenance department was all male. (Ford dep., p. 80, ln. 4, p. 81,ln.7).

In *Byrd v. Lakeshore Hospital*, 30 F.3d 1380 (11th Cir.1994), O'Neal points out, the Eleventh Circuit held that it violates the PDA to deny a pregnant employee a benefit generally available to temporarily disabled workers holding similar job positions. *See Byrd* at 1383-84. Under the PDA, plaintiff contends, the employer must ignore an employee's pregnancy and treat her "as well as it would have if she were not pregnant." *See Piraino v. Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996).

43

Despite this legal authority, plaintiff argues, Tyson did not ignore her pregnancy. Instead, O'Neal contends, direct comments were made that pregnancy would not be accommodated. *See Spivey* at 1313. Specifically, plaintiff asserts, Gonzalez commented about Tyson's new policy and Tyson's potential liability if she and her baby were injured. *See supra* for discussion of this. According to plaintiff, Gonzalez told her the new policy "did not accommodate pregnancy." (Pl.'s dep., p. 165; Pl.'s Exh. 15, p. 2, ¶ 2).

While acknowledging that the PDA allows for accommodation of employees injured on the job without similar accommodation to pregnant employees, plaintiff asserts that Tyson has to treat pregnancy and non-work related injuries the same but did not. According to O'Neal, workers with non-work related injuries were accommodated in violation of Tyson's own policies. Plaintiff gives the following alleged examples: Mary Tucker, Coy Snow, and O.K. Parks were allegedly accommodated for non-work related illnesses. (Pl.'s dep., pp. 195 -201); Phillip Gresham's and Louise Doss's heart conditions were allegedly accommodated in the part's room. (Ford dep., p. 28, ln. 17 - p. 29, ln. 9; Nappier dep., p. 18); and Jenny Turner was allegedly accommodated.[54]

Plaintiff argues: "This deviation, coupled with the direct evidence of pregnancy discrimination by Gonzalez, not only proves plaintiffs (*sic*) prima facie case under the PDA but also disputes defendant articulated reason --- a policy that states 'Tyson Policy does not allow for modified duty for non-work related temporary medical conditions.'" According to plaintiff, circumstantial evidence probative of intentional discrimination includes proof that the defendant's explanation is unworthy of credence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

---

[54] Plaintiff's allegations regarding these employees have been discussed earlier in this memorandum opinion, as well as in the section *infra* regarding her request for a protective order.

148, 120 S. Ct. 2097, 2109, 147 L.Ed.2d 105 (2000).

Plaintiff repeats her contention that she was as qualified to perform her job during her second pregnancy as during her first. In fact, plaintiff contends, her supervisors testified to their belief that she could perform her job during the second pregnancy. During her previous pregnancy, plaintiff asserts, she performed the essential functions of the job to the defendant's satisfaction. Plaintiff argues: "While the essential functions of the job required the plaintiff to drive a forklift, she had been required only three times in the last year to perform that task and one of those times was to renew her license not in the course of performing a job function." (Emphasis added).

## C.   PLAINTIFF'S ADA CLAIM DOES NOT FAIL AS A MATTER OF LAW AND DEFENDANT SHOULD NOT BE GRANTED SUMMARY JUDGMENT AS TO THIS CLAIM.

### 1.   Plaintiff's ADA Claim is not Outside the Scope of her EEOC Charge and Must Not be Dismissed as a Matter of Law.

Plaintiff asserts that she filed her own charge of discrimination with the EEOC and without the assistance of counsel. Moreover, plaintiff contends, her EEOC letter which represents the initial charge of discrimination specifically mentions the phrases "Americans with Disabilities Act of 1990," "regulations implementing section 501 of the Rehabilitation Act of 1973," "ADA," "disability," and "reasonable accommodation." Thus, plaintiff argues, defendant's claim that her charge did not mention the ADA is without merit.

After discussing the requirements of an EEOC charge as described in *Sanchez v. Standard Brands, supra*, plaintiff emphasizes that courts are "extremely reluctant to allow procedural technicalities to bar claims brought under [Title VII]." *See Sanchez* at 460-61. Sanchez further recognized that "the scope of an EEOC complaint should not be strictly interpreted." *Id.* at 465

45

(citation omitted).

Plaintiff agrees with defendant that the proper inquiry is whether O'Neal's complaint was like or related to, or grew out of, the allegations contained in her EEOC charge. In the EEOC, O'Neal asserts, she set forth the relevant dates of discrimination as well as the reasons why she believed she was terminated. Her letter to the EEOC, O'Neal asserts, thoroughly articulated her belief that she was discriminated due to her pregnancy in violation of "Title VII," "the American with Disabilities Act," "The Rehabilitation Act," and the "FMLA." According to plaintiff, her subsequently filed judicial complaint mirrors her EEOC charge and thus defendant's procedural argument is meritless.

> **2.    Plaintiff Can Establish a Prima Facie Case Because She is "Disabled" and Can Demonstrate that She Has a Physical or Mental Impairment that Substantially Limits One or More of Her Major Life Activities as Defined by the ADA.**

Due to plaintiff's pregnancy, O'Neal asserts, Tyson perceived plaintiff to be disabled. "The ADA provides that employers shall not discriminate against qualified individuals with a disability because of the disability." Wood v. Green, 323 F.3d 1309, 1312 (11th Cir. 2003)(citation omitted).

O'Neal contends that she has made a *prima facie* case of employment discrimination based on a disability under the ADA. Specifically, plaintiff notes, she has demonstrated that she had a disability, was otherwise qualified to perform the job, and was unlawfully discriminated against because of her disability.

According to plaintiff, "disability" is defined by the ADA as follows: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." *See* 42 U.S.C. § 12102(2); *see also, Harris v. H & W Contracting Co.*, 102 F.3d 516, 518-20 (11th

46

Cir.1996).

Plaintiff recites the three steps involved in a consideration of (A) above. *See Bragdon v. Abbott*, 524 U.S. 624 (1998). First, the court must determine if plaintiff has an impairment. Next, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. Finally, by "tying the two statutory phrases together," the court must determine "whether the impairment substantially limit[s] [plaintiff s asserted] major life activity." The Bragdon court further held that determining whether a claimed impairment constitutes a disability and whether an identified endeavor constitutes a major life activity under the ADA are questions of law.

While the ADA does not define "impairment," plaintiff points out, EEOC regulations state that a physical or mental impairment is: (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or (2) Any mental or physical disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities. 29 C.F.R. § 1630.2(h) (1998). (Emphasis added).

Furthermore, plaintiff argues, it is indisputed that she has a record of an impairment, as O'Neal was required to have her physician complete, in O'Neal's terms, "defendant's obsolete but appropriately named disability work permit." According to O'Neal, Tyson perceived her as disabled and forced the work permit issue in order to have her disability reduced to written form to require her to take leave without pay.

Moreover, O'Neal asserts, she can prove that Tyson regarded her as disabled. According to

47

O'Neal, courts have observed that the focus of the "regarded as" provisions are on the impairment's effect upon the attitude of others. *See Byrne v. Bd. of Educ.*, 979 F.2d 560, 566 (7th Cir. 1992). According to plaintiff, these provisions and regulations are intended to combat the effects of archaic attitudes, erroneous perceptions, and myths that have the effect of disadvantaging persons with, or regarded as having, disabilities. *See Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995). O'Neal observes that one purpose of the ADA is to prevent employers from taking adverse employment actions against disabled employees because they merely "feel" that their businesses are being disadvantaged due to the disabilities of those employees, without first determining whether those disadvantages could be ameliorated with a reasonable accommodation that does not place an undue hardship on the business.

In this case, O'Neal asserts, Tyson has not alleged that accommodating O'Neal caused it any hardship. Further, O'Neal argues, there is evidence that plaintiff was regarded by Tyson as disabled in the form of Gonzalez's (the human resource manager's) statements at the February 6, 2002 meeting. *See supra*. O'Neal argues: "This perception that pregnant women are clumsy and therefore a hazard to the workforce is outdated and the reason for the 'regarded' statute. Indeed, [defense] counsel spent an untold amount of time exploring plaintiff's minor work injuries that had resulted in no loss work claims filed by the plaintiff to suggest that if plaintiff had this number of injuries without being pregnant then her pregnancy would surely promote a more serious injury. (Pl. dep., pp. 69-92)." According to plaintiff, Gonzalez's statements coupled with Tyson forcing plaintiff to take disability leave substantiates her contention that Tyson perceived her as disabled. Accordingly, O'Neal argues, Tyson had an obligation to accommodate her but refused.

Next, O'Neal argues that she can show that she was a "qualified individual with a disability"

as defined by the ADA. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (quoting 42 U.S.C. § 12111(8)). Thus, O'Neal contends, she must show "either that she can perform the essential functions of her job without accommodation, or, failing that, show that she can perform the essential functions of his job with a reasonable accommodation." See id.. The essential functions of a job are determined on a case-by-case basis. Id. "[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Plaintiff lists the set of non-exhaustive factors used in determining whether a function is essential and repeats her argument about essential functions, see supra. According to O'Neal, a reasonable accommodation includes:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodation for individuals with disabilities.

42 U.S.C. § 12111(9).

O'Neal relies upon the following pronouncement from *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1286 (11th Cir.1997): "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." The Eleventh Circuit, plaintiff notes, has held that an employer's duty to reasonably

accommodate a disabled employee is not triggered unless the employee specifically demands an accommodation. *See Gaston v. Bellingrath Gardens & Home, Inc.*, 1999 WL 68111, **2-3 (11th Cir. 1999). Then plaintiff argues: "O'Neal submitted she had been accommodated in her job with her previous pregnancy and that her supervisors found her performance acceptable. Plaintiff identified, and it was common practice, that others came into the part's room to retrieve heavy items. Plaintiff was not required to climb a ladder to do her inventory job at the computer, nor was she required to drive a forklift more than twice a year. All other duties in the part's room, plaintiff could complete without accommodation."

Once the employee proves that a reasonable accommodation exists, plaintiff asserts, the employer may assert unreasonable hardship. *See Willis*, 108 F.3d at 286; *Morisky*, 80 F.3d at 447. For purposes of Title I of the ADA, employers are obligated only to provide a reasonable accommodation which enables a disabled employee to perform the essential requirements of the employee's job. *See Willis* at 283. Furthermore, plaintiff acknowledges that an employee is not entitled to her preferred accommodation but only one that is reasonable. *See Stewart* at 1285-86 (citations omitted). Employers thus are obligated only to provide "alternative employment opportunities reasonably available under the employer's existing policies." *See School Bd. of Nassau County v. Arline*, 480 U.S. 273, 289 n. 19 (1987).

Determining whether an individual is "qualified" for a job is a two-step process, plaintiff asserts, assessing first whether the individual satisfy the prerequisites for the position, e.g., does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job, and second, whether the individual can perform the essential functions of the job, either with or without reasonable accommodations. *See* 29 C.F.R. pt. 1630 app.

Plaintiff acknowledges that she bears the burden of proving that reasonable accommodations were available. *See Holbrook*, 112 F.3d at 1526. Furthermore, plaintiff concedes, reassignment is only a reasonable accommodation if a position for which the plaintiff is qualified is available. *See Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997).

In the instant case, O'Neal argues, Tyson neither provided nor made an attempt to provide her with an accommodation; rather, it relied on (in plaintiff's words) "an unpublished and new" policy to send the plaintiff home with a few weeks of disability pay and months with no pay. In fact, O'Neal contends, there were 210 jobs available within the plant during the year that plaintiff could have performed.

O'Neal relies upon this statement from Howell v. Michelin Tire Corp., 860 F.Supp. 1488, 1492 (M.D. Ala. 1994):

> A reasonable accommodation, therefore, is one that would enable an employee with a disability to enjoy an equal opportunity for benefits and privileges of employment as are enjoyed by employees without disabilities. It includes reassignment to a vacant position. Reasonable accommodation, however, does not require that an employer create a light-duty position or a new permanent position. But, if an employer has a vacant light-duty position or a vacant permanent position for which the disabled employee is qualified, it would be a reasonable accommodation to reassign the employee to that position. If the position was created as temporary job, the reassignment to that position need only be for the temporary period of the job. Therefore, if a light-duty job is a temporary job, reassignment to that job need only be for the temporary period of the job, and an employer need not convert a temporary job into a permanent one. However, if a light-duty job is a permanent job, the assignment to the job must be for the entire time the job exists. Obviously, the employer is not required to reassign a disabled person to a vacant position unless the disabled person is qualified for the position. A disabled person is qualified for a vacant position if he can perform the "essential functions" of the position, with or without a reasonable accommodation, such as a restructuring, with regard to the position.

51

Plaintiff points out that she had previously worked on the production line until she bid on the parts room job in 1998. According to O'Neal, defendant allowed pregnant women to continue working on the production line and hired new employees "off the street" to work on the production line. Plaintiff reiterates Burdick's testimony regarding turnover rates at Tyson. See supra.

Based on the foregoing, O'Neal argues, a genuine issue of material fact exists about whether Tyson made a good faith effort to accommodate O'Neal.

## III.   Defendant's Reply

First, Tyson argues, while plaintiff seeks to jettison the legal standard for summary judgment set forth in McDonnell-Douglas in favor of Desert Palace, her sole authority is a Minnesota district court opinion. Two federal courts within Alabama, Tyson contends, have rejected such an argument. *See Sanders v. City of Montgomery*, 2004 U.S. Dist. LEXIS 10000 at 47-48 (M.D. Ala. 2004)(concluding that "neither this Court, nor the Eleventh Circuit ..., has adopted either of these interpretations of the impact of *Desert Palace* on the analysis of summary judgment in discrimination cases"); *Herawi v. State of AL Dep't of Forensic Sciences*, 311 F. Supp. 2d 1335, 1345 (M.D. Ala. 2004)(citations omitted).[55] Even should the court adopt O'Neal's argument in this

---

[55] Specifically, the *Herawi* court stated:

> For a number of reasons, to paraphrase Mark Twain, reports of the death of *McDonnell Douglas* are exaggerated. As stated, in *Desert Palace*, the Supreme Court merely held that a plaintiff need not present "direct evidence" to establish liability--partial or full--under Title VII, but that a plaintiff may do so by "using direct or circumstantial evidence." 539 U.S. at 99, 123 S.Ct. at 2154 (internal quotations and citations omitted). *Desert Palace* addressed whether direct evidence is necessary to establish Title VII liability.
>
> *McDonnell Douglas*, in contrast, did not address the necessity of direct evidence but rather articulated one methodology for establishing liability through circumstantial evidence. The *McDonnell Douglas* approach is a "procedural device," *St. Mary's Honor Center v. Hicks*,

regard, Tyson contends, she has not offered sufficient circumstantial evidence to survive summary judgment.

Next, Tyson asserts, O'Neal has failed as a matter of law to establish a claim of ADA discrimination. Tyson repeats its assertion that plaintiff does not have a physical impairment that substantially limits a major life activity. While O'Neal quoted the EEOC Compliance manual regarding disorders of the reproductive and genito-urinary systems as constituting "physical impairments," Tyson notes that the same Compliance Manual advises that "[o]ther conditions, such as pregnancy, that are not the result of physiological disorder are also not impairments." *See* 29 C.F.R. section 1630.2(h)(emphasis added). Furthermore, Tyson contends: "The irony of plaintiff's ADA and PDA arguments is inescapable. On one hand she argues as evidence of discrimination an alleged statement expressing concern for her and her baby's safety during her pregnancy and on the other hand she argues that the sheer fact that she was pregnant rendered her disabled under the ADA." Tyson further notes that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." *Id.* at 2(j).

Again, Tyson reiterates, it is unaware of any court that has determined that pregnancy per se is a disability under the ADA. *See, e.g., Gorman v. Wells Manu. Corp.*, 209 F. Supp. 2d 970, 976 (S.D. Iowa 2002), *aff'd* 340 F.3d 543 (8th Cir. 2003)(finding that no court maintains that pregnancy per se is an ADA-qualifying disability.") Furthermore, Tyson contends, most federal courts have held

---

509 U.S. 502, 521, 113 S.Ct. 2742, 2755, 125 L.Ed.2d 407 (1993); "it is ... a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (internal quotations and citations omitted). There is nothing in *Desert Palace* to undermine the usefulness of *McDonnell Douglas*.

that pregnancy-related medical conditions without unusual circumstances do not constitute such a disability. *See, e.g., Jessie v. Carter Health Care Ctr., Inc.*, 926 F. Supp. 613 (E.D. Ky. 1996). Further, defendant contends, plaintiff's medical restrictions of no weight lifting, no climbing ladders, and no forklift operation do not constitute a "disability" as defined by the ADA. *See Otis v. Canadian Valley-Reeves Meat Co.*, 884 F. Supp. 446 (W.D. Okla. 1994)(70-pound lifting restriction found not to restrict major life activity and not to constitute a disability within the meaning of the ADA).

Similarly, Tyson deems plaintiff's one-paragraph "record of impairment claim" meritless. Tyson relies on *Gordon v. MCG Health, Inc.*, 301 F. Supp. 2d 1333, 1341 (S.D. Ga. 2003), in which a plaintiff asserted a "record of impairment" claim based on several documents from the employer recording the plaintiff's medical condition and limitations. *Gordon* held: "Although this evidence tends to prove that the plaintiff has a record of impairment, it fails to establish a record of disability under the ADA. The record standard is satisfied only if the plaintiff actually suffered a physical impairment that substantially limited one or more of her major life activities."[56]

---

[56] This court further quotes *Gordon*:

> It is undisputed that the plaintiff's numerous impairments restrict her from lifting more than ten pounds, or engaging in repetitive bending, squatting, and stooping, and shoulder-level or overhead work. However, the plaintiff's physical impairments do not substantially limit any major life activity. "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 200-01, 122 S.Ct. 681. The plaintiff has demonstrated by her own testimony that she lives alone and is able to cook and clean, as well as drive long distances and otherwise take care of herself. (Gordon Dep. at 85-87, 209-10, 275-76.) Therefore, her impairments clearly do not prevent her from performing activities central to people's daily lives and do not substantially limit a major life activity. *See Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir.2000); *Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1228 (11th Cir.1999).

Moreover, Tyson contends, O'Neal has failed to establish that defendant regarded her as disabled. In this vein, Tyson argues: "In support of this allegation, Plaintiff asserts that she is 'regarded as' disabled because a human resources manager allegedly commented that Tyson would be responsible if plaintiff did not abide by her work restrictions and she fell off a ladder. This allegation simply cannot support a 'regarded as' claim under the ADA as a matter of law." Tyson repeats its analysis of the requirements of a "regarded as" claim.

Further, defendant analogizes O'Neal's situation to that the plaintiff's *Richards v. City of Topeka*, 173 F.3d 1247, 1250 (10th Cir. 1999). The *Richards* plaintiff argued that even though her pregnancy did not qualify as a disability under the ADA, she was regarded as disabled by her employer because she was reassigned from her regular duties to light duty, and the collective bargaining agreement between her employer and her union stipulated that pregnancy "shall be considered as temporary medical disabilities and shall be treated as such." In its analysis, plaintiff notes, the *Richards* court stated:

> Richards argues that the City illegally discriminated against her under § 1630.2(l)(3) by treating her as having a "substantially limiting impairment," although her pregnancy does not constitute a physical impairment under paragraphs (h)(1) and (2). Her interpretation of § 1630.2(l)(3) reads an exception into the ADA's definition of disability that would swallow the statute itself, enabling prospective plaintiffs to claim discrimination against disabilities that are excluded from coverage by the Act. Moreover, the EEOC's interpretive guidelines for the term "substantial limitation in a major life activity" clearly bars appellant's argument. "An individual satisfies the third part of the 'regarded as' definition of 'disability' if the employer or other covered entity erroneously believes the individual has a substantially limiting impairment that the individual actually does not have." 29 C.F.R. § 1630 app. § 1630.2(l ). Because Richards concedes her pregnancy is not a substantially limiting impairment under the ADA, her claim does not remotely fall within this definition.

Defendant reiterates its contention that plaintiff is also not a "qualified individual with a disability." According to Tyson, O'Neal has only offered general assertions that she could perform

her essential functions as a parts room attendant even with her medical restrictions. Tyson highlights an excerpt from plaintiff's own testimony as belying her argument that lifting over 15 pounds, ladder-climbing, and forklift operation are not essential functions: "Q: That's all I want to be clear about, is that in January of '02, there were – if you had not had any restrictions at all, you would have been carrying items that weighed more than fifteen pounds, right? A: Correct. Q: And you have been climbing a ladder from time to time? A: Correct. Q: Probably on a daily basis; right? A: Correct." Tyson highlights O'Neal's testimony that she had to sometimes operate a forklift because she was the only hourly employee working on the third shift certified to do so.

While O'Neal asserts that the job functions which she performed were not essential because others could have performed them, Tyson contends, the employer need not reallocate the essential functions of a job that a qualified individual must perform in order to accommodate an employee under the ADA. *See Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1122-23 (8th Cir. 1995). While plaintiff asserts that she should have been transferred to the evisceration department because she could have performed these positions under her physician-imposed restrictions, Tyson contends that she has offered no evidence that she ever requested a transfer. Furthermore, Tyson repeats, in order for a transfer to constitute a possible reasonable accommodation, a vacancy must exist at the time of the request. Here, Tyson argues, O'Neal has offered no evidence of specific available vacancies or available positions for which plaintiff applied.

Finally, Tyson contends, plaintiff fails to offer any evidence of discriminatory intent. While plaintiff proffers the alleged statement by Gonzalez as direct evidence of discrimination, Tyson contends that it is undisputed that Gonzalez was not involved in the decision to place plaintiff on

56

medical leave.[57] Further, Tyson argues, remarks which are isolated and unrelated to the challenged employment decision are not direct evidence of discrimination. *See Rojas v. Florida*, 2002 WL 448490, *2 (11th Cir. 2002).[58] Tyson adds that plaintiff has offered no evidence that any decision-maker harbored discriminatory intent towards her because of her alleged disability.

Even if plaintiff had made out her prima facie ADA case, Tyson argues, she has failed to rebut Tyson's reason for its employment decision. Again, Tyson reiterates, it is undisputed that Tyson was following a lawful and legitimate leave of absence policy when it placed O'Neal on medical leave in February 2002. Tyson contends that O'Neal has offered no evidence of inconsistency or untruth by Tyson.

Additionally, defendant repeats, the ADA claim falls outside the scope of plaintiff's EEOC charge. Defendant argues that the letter to the EEOC upon which O'Neal relies was written before her EEOC charge was filed and that the charge itself did not mention the ADA or discrimination due to a disability. Further, Tyson contends, the EEOC charge does not allege that plaintiff was substantially limited in any major life activity or that she requested accommodation. Tyson notes that the Notice of Charge of Discrimination sent to Tyson similarly does not refer to a disability claim.[59] Finally, Tyson observes, the letter to the EEOC relied upon by plaintiff also stated: "The

---

[57] In the court's view, the cited pages of Burdick's deposition do not unequivocally support Tyson's contention.

[58] *Rojas* found that stray remarks alone were not sufficient evidence of pretext.

[59] *See Vakharia, M.D. v. Little Co. of Mary Hosp. & Health Care Cntr.*, 917 F. Supp. 1282, 1294 (N.D. Ill. 1996)(finding that the EEOC intake questionnaire did not serve as a 'charge' for purposes of notifying defendants). However, the court notes, the *Vakharia* court explained its finding as follows:

> The copy of Vakharia's charge, submitted with her responsive pleadings, names only the Hospital as the perpetrator of discrimination. Vakharia states that her EEOC "intake questionnaire" sufficiently notified all Defendants of the charges against them. Vakharia completed the questionnaire by referring the reader to a

ADA does not consider a woman going through a normal pregnancy as being disabled."

Turning to plaintiff's Pregnancy Discrimination Act claims, Tyson asserts, O'Neal has proffered improper comparators and failed to establish that she suffered from a differential application of work rules.

Regarding Louise Doss,[60] Tyson argues, plaintiff mistakenly argues that Doss had a heart condition and was "accommodated" by working in the parts room and being permitted not to climb over a three-foot ladder or lift over eight pounds. To rebut this evidence, Tyson offers the following excerpt from Ford's testimony:

> Q: Does (*sic*) both Mr. Gresham and Ms. Doss work in the parts room?
> A: Yes.
> Q: Do you know what their limitations are?
> A: No.  I have not been told any limitations on either one of them as of yet ...
> Q: Did Ms. Dawson (Doss) also have heart surgery?
> ....
> A: If I'm not mistaken, she has high blood pressure.
> Q: And was she placed in the parts room to accommodate her high blood pressure?
> A: I believe she signed a bid sheet like everybody else.
> ....
> Q: Do you now if Ms. Doss has a climbing restriction that she can't go over three feet?
> A: I haven't seen one.
> Q: Do you know?

copy of her Complaint for the names of the discriminators. The court finds that this questionnaire does not serve as a "charge" for purposes of notifying Defendants. See Jones v. United Air Lines, No. 94 C. 4506, 1995 WL 491497, at *4 (N.D.Ill. Aug. 14, 1995) (holding that the job applicant had not satisfied EEOC filing preconditions where defendants were named in several EEOC questionnaires describing alleged discrimination, but not in an official "charge"). [FN5] Accordingly, Vakharia has not complied with the EEOC requirements in filing her Title VII and ADEA charges against any Defendant except the hospital.

[60] Tyson further asserts: "It is interesting that Plaintiff identifies Doss and Turner as comparators when she filed a motion for protective order asking the Court to bar Tyson from introducing any evidence or testimony regarding these individuals because they were not listed as witnesses in Tyson's initial disclosures.  Plaintiff's argument that Doss and Turner are comparators for her PDA claim proves Tyson's point that any evidence offered regarding these individuals is rebuttal evidence that should not be excluded by the Court."

> A: No ma'am.
> Q: Do you know what Ms. Doss's lifting restrictions are?
> ....
> A: I haven't been told of any.

Between this testimony and Doss's own declaration, Tyson contends, it is undisputed that Doss was

never accommodated by Tyson for a non-work-related medical condition.

Turning to Phillip Gresham, Tyson highlights Ford's deposition as follows:

> Q: Do you know of an individual who had a heart problem that was placed in the parts room?
> ....
> A: We have best of my knowledge two people who have a diagnosed heart condition. But as far as being prior to, I have no knowledge of anybody being aware of it prior to being hired into the parts room. ...
> Q: Who?
> A: Phillip Gresham and Louise Doss?
> ....
> Q: Do you know what their limitations are?
> A: No.  I have not been told any limitations on either one of them as of yet.  I know Phillip, he was out of work for I believe it was two weeks after his heart surgery.  As far as limitations, I wasn't told any for him.
> Q: Did Mr. Gresham work in the parts room before he had heart surgery or after?
> A: Both.

Ford further testified as follows:

> Q: Do you know if Mr. Gresham can climb ladders?
> A: I've seen him climb a ladder.
> Q: Do you know of any restriction he has placed on him by a doctor that he is not to climb ladders?
> A: I haven't seen anything.
> Q: Do you know how – what his lifting restrictions are?
> A: I have not been told of any.  I don't know if he's got any or not.

Tyson also highlights the following excerpt from Nappier's deposition to show that

Gresham both climbed ladders and operated the forklift:

> Q: How about Phillip Gresham?  Do you know Mr. Gresham?
> A: He works in the parts rom.

59

> Q: Does Mr. Gresham have some physical limitations?
> A: If he's got limitations, I have never seen the paperwork on it.
> Q: I understand.  Do you know without seeing the paperwork that he has physical limitations?  Has it been told to you?
> A: I don't think it had.
> ....
> Q: Does Mr. Gresham climb a ladder?
> A: Yes, ma'am.
> ....
> Q: Does Mr. Gresham drive a forklift?
> A: Yes, ma'am.

Further, Tyson insists, there is no evidence to dispute Burdick's testimony that Gresham has worked full duty at Tyson since 1997 and has not brought any doctor's restrictions to Tyson's attention during that time.

Regarding Mary Tucker's alleged accommodation for a non-work-related illness, i.e., osteoporosis, Tyson asserts that since the source of this information was coworkers, it is inadmissible hearsay unavailable to plaintiff.  Furthermore, Tyson notes, osteoporosis is a permanent, as opposed to temporary, medical condition.  Finally, Tyson relies on Burdick's testimony that Tucker's osteoporosis did not include medical restrictions and that Tucker worked the regular duties of her job.

Turning to the allegation that Coy Snow was temporarily assigned to the parts room to accommodate a non-work-related illness, Tyson asserts, such allegation is unfounded.  Tyson highlights Ford's testimony that he was aware of Snow working in the parts room for a few days but was not aware of why Snow was working there.  Further, Ford testified that he did not have any knowledge of Snow being placed on any work restrictions.  Tyson emphasizes Burdick's

declaration.[61]

Regarding O.K. Parks as an alleged comparator, Tyson notes, O'Neal has conceded that it is not a violation of the PDA for Tyson to treat individuals with work-related medical conditions differently that those with non-work related medical conditions. It is undisputed, Tyson argues, that Parks was reassigned to the box room because of her on-the-job injury under Tyson's worker's compensation policy. Burdick testified that Parks's latex allergy is work-related and has been determined by a workers' compensation adjuster to be a workers' compensation injury. Moreover, Tyson asserts, the undisputed evidence is that Parks's medical condition is permanent rather than temporary.

Finally, Tyson contends, Virginia ("Ginny") Turner is also not an appropriate comparator. While plaintiff contends Turner was transferred to another department because she was on blood thinners, Tyson asserts, that evidence is based solely on plaintiff overhearing Turner in the nurse's

---

[61] Burdick's declaration stated:

> Coy Snow is a Tyson employee at the Heflin plant who has received medication and/or treatment for a heart-related condition. Mr. Snow has worked regular duty without doctor-imposed restrictions prior to June 2001. From June 27, 2001 to July 18, 2001, Mr. Snow had documented doctor's restrictions of no lifting over 20 lbs for an expected two weeks. This was not a work-related condition and he was placed on FMLA leave of absence for the 6-week actual duration of these restrictions under Policy One, the pre-2002 Tyson policy. Then, from August 1, 2002 to August 21, 2002, he was out of work and then he returned with a schedule limitation of working only eight hours per day. Tyson adjusted his work schedule and applied the missed work time to intermittent FMLA leave. MR. Snow could perform the essential functions of his job and needed only a schedule change. Mr. Snow returned to a regular full schedule as of September 18, 2002. Tyson's Policy One, the pre-2002 policy, did not provide for accommodation of temporary medical restrictions that were not work-related and, for this reason, Snow did not get the accommodation in 2001 that a pregnant, work-restricted employee would have gotten. In 2002, with the new policy, pregnancy and other non-work-related medical restrictions would be treated the same, but Mr. Snow's schedule limitation was different from Ms. O'Neal's job-function restrictions under the January 2002 leave policy.

61

office at a time when Turner was upset because Tyson was shutting down Turner's department or one night and Turner was being sent home because she could not work in evisceration due to her condition. Tyson argues: "It is unclear how being sent home (just as Plaintiff was when on medical leave) is preferential treatment." Moreover, Tyson contends, both Burdick and Turner have declared that Turner's transfer to the paw room in 1996 was a regular transfer rather than an accommodation under a leave policy. Tyson further contends that Turner is not a proper comparator because she is taking anti-coagulants for lupus, a permanent medical condition. Finally, Tyson relies on Turner's declaration, which states that Turner has never provided the company with any work restrictions or asked Tyson for any accommodation because of her medical condition.

In conclusion, Tyson reiterates: (1) its contention that plaintiff's prima facie case fails because she was not qualified for the position due to her medical restrictions regarding forklift operation, climbing a ladder, and lifting over 10-15 pounds; and (2) that plaintiff has not rebutted Tyson's legitimate, non-discriminatory reason for the employment decision, i.e., its Policy 2 implemented in January 2002.[62]

---

[62] In criticizing plaintiff's evidence of pretext, i.e., Gonzalez's statement regarding plaintiff's work restriction of no ladder climbing, Tyson relies upon *Daugherty v. Genesis Health Ventures of Salisbury, Inc.*, 2004 WL 1047388 (D. Md. 2004). The *Daugherty* court stated, in pertinent part:

> Plaintiff testified on deposition to certain comments made by managerial employees of the defendant, both at the time she was hired and around the time she disclosed she was pregnant, that were suggestive of an "anti-pregnancy" attitude on the part of defendant generally. As a matter of law, however, those comments do little more than reflect the explicit policy which I conclude on this record does not rise to the level of "discrimination." In other words, it is clear that defendant had an "animus" toward pregnant nursing staff employees who have substantial work restrictions, just as it had an "animus" toward nursing staff employees (male and female) who, on account of injuries or illnesses suffered off-the-job, must be replaced by new hires under the "no light duty" policy. As mentioned above, the disparate treatment here is clearly intentional, but it does not equal unlawful discrimination, because the disparate treatment complained of does not involve a classification that singles out pregnancy-based disability for less favorable treatment.

**MOTION FOR PROTECTIVE ORDER TO EXCLUDE ANY TESTIMONY OR REFERENCE TO THE TESTIMONY OF TONYA AVERITT, HELEN CHAMPION, LOUISE DOSS, SHERRY STEPHENS AND VIRGINIA TURNER**

I.      **Plaintiff's Motion**[63]

According to O'Neal, defendant did not disclose these witnesses as required by FRCP 26(1)(a) and therefore their testimony should be excluded.  O'Neal argues that Rule 37(c)(1) mandates that a party who without substantial justification fails to disclose information or to amend a prior discovery response pursuant to Rule 26 may not use such evidence on a motion unless such failure is harmless.  The purpose of Rule 37, plaintiff contends, is to ensure that the case's merits can be addressed at trial without any party suffering prejudice as a result of nonfeasance or malfeasance during discovery.  *See Centagon, Inc. v. Bd. of Directors of 1212 LakeShore Drive Condo. Ass'n.*, 2002 WL 356483, *4 (N.D. Ill. 2002).  "'The power of the trial court to exclude exhibits and witnesses not disclosed in compliance with its discovery and pretrial orders is essential' to judicial management of the case." *Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995)(*citing Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 897-98 (8th Cir.1978)).

According to O'Neal, the failure to disclose Averitt, Champion, Doss, Stephens, and Turner is not harmless,[64] since this omission not only affected the plaintiff's litigation strategy but directed

_____

[63] In the alternative, plaintiff requested that this court stay her reply to defendant's motion for summary judgment and reopen discovery to allow plaintiff to depose these individuals prior to responding to defendant's motion.  Considering that plaintiff already filed a reply, it appears to the court that request is now moot.

[64] According to plaintiff, the trial court has broad discretion to determine whether a failure is harmless, *see Brand Name Prescription Drugs Antitrust Litig.*, 2001 WL 30454, *1 (N.D. Ill. 2001)), and applicable factors to be considered are surprise or prejudice to the blameless party, the ability of the offender to cure any resulting prejudice, the amount of disruption to trial that would result from permitting the use of the evidence, and any bad faith involved in the failure to produce the evidence at an earlier date. *See Spearman Indust., Inc., v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1094 (N.D. Ill. 2001)(citation omitted).

63

plaintiff's selection of deponents and requested documents.  O'Neal points out that defendant's initial disclosures listed only seven individuals.  O'Neal reminds this court that Rule 26 provides that a party is to disclose witnesses it "may use to support its claims or defenses."  As a result of this omission, O'Neal further argues, she will be prejudiced in preparation of her response to summary judgment.  *See, e.g., Hermeling v. Montgomery Ward & Co., Inc.*, 851 F. Supp. 1369, 1376 (D. Minn. 1994)("Furthermore, Hermeling's counsel's untimely disclosure has unfairly prejudiced Montgomery Ward in its preparation for this motion [for summary judgment] by effectively precluding any type of formal rebuttal.")

While acknowledging defendant's change of associate counsel during the pendency of the case, O'Neal asserts that any discovery oversight due to this change should not prejudice plaintiff in the prosecution of her case.  Moreover, plaintiff argues, in its discretion the court may both preclude evidence as well as impose other appropriate sanctions.  Plaintiff relies on *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639 (1976), in which the Supreme Court stressed policy reasons for enforcing discovery rules.[65]

## II.     Defendant's Response

Defendant agrees with plaintiff that sanctions for abuse of discovery are within the court's discretion and that factors to be considered include "prejudice or surprise to the opposing party,

---

Plaintiff relies upon *Bowe v. Consolidated Rail Corporation*, 2000 WL 1434584, *2 (6th Cir. 2000)(unpublished)("It is well-established by this Court and others that Rule 37(c)(1) mandates that a trial court shall sanction a party for discovery violations in connection with Rule 26 unless the violations were harmless or were substantially justified.")

[65] The *National Hockey League* court stated that the most severe sanctions under the rule "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  *Id.* at 643.

ability to cure prejudice, likelihood of disruption, and moving party's bad faith or unwillingness to comply." *See Newman v. GHS Osteopathic, Inc., v. Parkview Hosp. Div.*, 60 F.3d 153, 156 (3rd Cir. 1995).

First, defendant argues, it was not required to disclose these witnesses pursuant to Rule 26. According to Tyson, it does not rely on the testimony of these witnesses to support its defense in this matter but rather for impeachment purposes. Defendant reminds this court that the plaintiff bore the burden to identity comparators similarly situated "in all relevant respects." *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). Here, Tyson asserts, it offered the testimony of the above-listed witnesses in order to rebut plaintiff's allegations that they are appropriate comparators. For instance, plaintiff's response brief argued that Virginia Turner and Louise Doss are comparators and that Helen Champion was displaced from her job in order to accommodate another alleged comparator. Furthermore, Tyson argues, plaintiff's deposition and discovery requests had led Tyson to believe that she was alleging additional comparators in the form of Averitt and Stephens. Tyson contends: "The fact that plaintiff has abandoned these allegations does not change that their testimony was offered to rebut plaintiff's allegations, not to establish Tyson's defense."

Second, Tyson argues, plaintiff's invocation of "unfair surprise" which allegedly prevented her from conducting discovery regarding these witnesses lacks merit. Tyson repeats its assertion that these witnesses were identified by plaintiff in her own deposition. Further, Tyson asserts, plaintiff's discovery requests served on April 19, 2004, requested the personnel files of Champion, Stephens, Averitt, and Turner. Moreover, Tyson contends, plaintiff's counsel asked questions about Doss in Ford's deposition, thereby identifying her as a witness. In fact, Tyson asserts, plaintiff offered

evidence regarding several of these individuals in her motion for summary judgment response brief.[66]

## CONCLUSIONS OF THE COURT

The court has fully recounted the parties' contentions in case there is a later *de novo* review. It is not necessary, however, for this court to determine all the raised issues. Some matters which are obvious are decisive.

First, it is patently obvious that the plaintiff did not have, at any pertinent time, an impairment which substantially limited one or more of her major life activities. *Compare Rossbach v. City of Miami*, 371 F.3d 1354 (11th Cir. 2004). Plaintiff has not cited any persuasive case suggesting that her pregnancy is a disability as defined by the ADA. The authority cited above to the contrary is overwhelming. There is no substantial evidence creating a reasonable inference that any decision maker (or in reality anyone else) considered her as disabled as defined by the ADA. Plaintiff's ADA claim is due to be dismissed.

With regard to the Pregnancy Discrimination Act claim, there is no substantial evidence that any similarly situated employee was treated differently than the plaintiff. The court has addressed that evidence above. An irony is that if the plaintiff had not been placed on leave of absence, her treatment could have later been used by a variety of future employees to argue different treatment. In essence, the plaintiff was disturbed because a change in policy caused her to be treated differently

---

[66] In this regard, defendant argues: "Plaintiff should be held to the same standard she is asserting against Defendant for utilizing the testimony of these witnesses. Plaintiff did not identify these witnesses in her ... disclosures yet utilizes testimony and evidence regarding these witnesses to establish her claims in these matters.... As such, if Defendant is precluded from offering testimony regarding these witnesses, Plaintiff should also be precluded under FED. R. CIV. P. 37(c)(1)."

than she was treated during her first pregnancy.  The PDA claim will be dismissed.[67]

This the 19th day of July, 2004.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE

---

[67]The plaintiff's Motion for Protective order will be denied.  The witnesses are offering rebuttal evidence to conclusory allegations.  Plaintiff has withdrawn her FMLA claim.